DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment by the Williams County Court of Common Pleas, Juvenile Division, which terminated appellant-mother Dawn Y.'s parental rights to Amber L., Dalton L., and Dylan L., and granted permanent custody to appellee, Williams County Department of Job and Family Services ("agency"). For the reasons that follow, we affirm.
 {¶ 2} Appellant Dawn Y. is the biological mother of the subjects of this appeal: Dalton L., born in 1992; Dylan L., born in 1993; and Amber L., born in 1995. Appellant is also the mother of two older half-siblings, who are not involved in this appeal: Amanda E., born in 1988, and Matthew E., born in 1989.
 {¶ 3} Terry L. is the biological father of appellant's three youngest children. During the pendency of these proceedings, he resided outside the state of Ohio, first in Florida, then in Arizona.
 {¶ 4} The agency first became involved with appellant's children in January 2002, when appellant was incarcerated in the state of Michigan, and appellant's then boyfriend, now husband, Robert Q., moved all five children to Bryan, Williams County, Ohio. The agency took custody when Robert Q., who did not have legal custody, attempted to enroll the children in school. The children were returned to appellant upon her release from incarceration in March 2002.
 {¶ 5} The agency next became involved with the family on June 19, 2002, when it was reported that appellant had abandoned Matthew and Dylan at a shopping complex in Fort Wayne, Indiana after being caught shoplifting.
 {¶ 6} During a home visit on June 20, 2002, social worker Tiffany Kime noticed marks on Dylan's cheek. Both appellant and Robert Q. admitted that Robert Q. had struck the child. The agency responded by implementing a safety plan which provided that neither appellant nor Robert Q. would use any kind of physical discipline on the children, and that Robert Q. would have no unsupervised contact with the children for a specified period of time.
 {¶ 7} On July 2, 2002, appellant and Robert Q. signed a voluntary service agreement. Just two days later, on July 4, 2002, the agency received notification that appellant had once again abandoned two of her children after being caught shoplifting. This time, the incident occurred at a supermarket in Bryan, Ohio, and Amanda and Dylan were the children who were left. All five children were taken into agency custody, and all five children were placed into foster care. Appellant, who had absconded from the area, left several telephone messages with the agency wherein she indicated that she was seeking mental health treatment. However, appellant's whereabouts were unknown to the agency for approximately one month.
 {¶ 8} After about two weeks in the initial foster home placement, appellant's two older children were placed with their paternal grandmother in Defiance County, Ohio, and the three younger children were placed in a second foster home. Several weeks after that placement, the three younger children were transferred to a third foster home, where they remained together, with foster parents Mr. and Mrs. C., until May 2003.[1]
 {¶ 9} On August 5, 2002, appellant was incarcerated on charges from the state of Indiana. She remained in the Indiana prison system for the next ten months, until her release on April 11, 2003. During this time, appellant maintained contact with her three younger children through letters and telephone calls.
 {¶ 10} Shortly after appellant's release, appellant's older children were returned to her home, while her younger children remained in foster care. According to the agency, its goal at that time was to reunify the family after appellant and Robert Q. had complied with the requirements set forth in the amended case plan.
 {¶ 11} The case plan, as amended in May 2003, required that appellant and Robert Q. participate in drug and alcohol assessments and complete parenting classes; that Robert Q. complete anger management classes; and that appellant undergo a psychological evaluation and follow all recommendations for further treatment, participate in individual therapy, obtain full-time employment, maintain that employment for at least two months, and report all employment to the agency.
 {¶ 12} The agency assisted appellant and Robert Q. in meeting their goals, by referring Robert Q. to the Maumee Valley Guidance Center for anger management classes and by scheduling appellant's psychological evaluation with psychologist Dr. Diane Peters. In addition, the agency recommended that appellant attend individual therapy sessions with counselor Sue Lane Baldwin.[2]
 {¶ 13} The agency also arranged for supervised visitation between appellant and the children.[3] The family had 31 regularly scheduled visits through The Meeting Place from May 3, 2003 through October 3, 2003. Visits occurred once or twice per week. Out of the scheduled visits, appellant missed six visits due to cancellation or "no show" and was late or left early for eight visits.
 {¶ 14} In July 2003, appellant was involved in the theft of a purse (with a subsequent attempt to swindle reward money from the victim), which led to felony charges against her in Defiance County.
 {¶ 15} On October 15, 2003, appellant began a 58-day period of incarceration on a holder out of Indiana. That month, the children's father, Terry L., expressed his desire to have custody of the three minor children. An interstate home study was begun in order to determine the appropriateness of such a placement.
 {¶ 16} In December 2003, following her release from incarceration, appellant filed a pro se motion with the trial court wherein she sought reinstatement of visitation with her children. Counsel was appointed to represent her and a hearing was held. The children's counselors, Sue Lane Baldwin and Jeff Bishoff, each recommended that physical contact between appellant and the children be stopped due to the emotional and behavioral disruptions that it caused with respect to the children.[4]
In a journal entry dated March 4, 2004, the court continued the matter "due to the current uncertainty surrounding several key issues." Apparently, the matter was never revisited, and appellant's visits with her children were never reinstated.[5]
 {¶ 17} In a letter dated January 7, 2004, written to the Ohio Department of Job and Family Services in Columbus, Ohio, caseworker Kime acknowledged that the agency was no longer working on the goal of reunification with appellant, but rather was seeking possible placement with the children's father, Terry L.
 {¶ 18} On July 16, 2004, appellant pled guilty to felony receiving stolen property. On July 23, 2004, the agency — having determined that placement with Terry L. would be inappropriate — filed a motion for permanent custody of the children, pursuant to R.C. 2151.413. Hearings on the motion were held over the course of several months, with evidentiary hearings held on November 2-4, 2004 and on December 16-17, 2004, and a dispositional hearing held on February 16, 2005. In addition, an in camera interview was conducted in chambers, on the record, with counsel present, on December 22, 2004.
 {¶ 19} The evidence adduced at the hearings relevantly provides as follows. With respect to appellant's and Robert Q.'s compliance with the agency case plan, it is undisputed that both appellant and Robert Q. completed the drug and alcohol assessment, and that appellant completed the psychological evaluation through Dr. Peters. Although neither appellant nor Robert Q. completed parenting classes, appellant did attend several of the children's therapy sessions in the summer of 2003, until July 28, 2003, when the trial court discharged her from this service.
 {¶ 20} The parties are in dispute as to appellant's level of compliance with the psychological treatment and financial stability requirements that were set forth in the case plan. Appellant points out that, in addition to completing the psychological evaluation with Dr. Peters, she participated in several other therapy programs, including one with Sue Lane Baldwin, as was recommended by Dr. Peters.
 {¶ 21} In July 2003, appellant did begin therapy with Sue Lane Baldwin, but she attended just two sessions before rejecting Baldwin as her therapist.[6] In the fall of 2003, appellant participated in another two sessions with therapist Charles Huntingford. And between December 2003 and February 2004, she participated in a total of four sessions with therapist Sue Keister.
 {¶ 22} Finally, in the summer of 2004, the agency referred appellant to Harbor Behavioral Healthcare. Appellant subsequently reported to the agency that she had begun therapy at Harbor Behavioral Healthcare with someone named Emma. However, because appellant refused to sign a release, the reported treatment could not be verified.
 {¶ 23} Appellant testified at the permanent custody hearing that, in addition to attending the aforementioned counseling sessions at Harbor Behavioral Healthcare, she was currently being treated for bipolar disorder by her "regular" doctor, Dr. Blad, and by her psychiatrist, Dr. Mercado. Appellant stated that her treatment involved not just counseling but also medications, including Tradizone, Adavan, Seriquill, Taupamax, and Prozac. According to appellant, the medications dramatically improved her mental health, enabling her to hold a job, go to school, concentrate on her work, and control her behavior.
 {¶ 24} The agency, for its part, describes a markedly different situation regarding appellant's psychological diagnosis and treatment. According to Dr. Peters, appellant suffers from the following four conditions: (1) post-traumatic stress disorder; (2) generalized anxiety disorder; (3) major depressive disorder; and (4) borderline personality disorder. Dr. Peters' assessment contains no mention whatsoever of bipolar disorder.
 {¶ 25} In terms of treatment, Dr. Peters opined that post-traumatic stress disorder, generalized anxiety disorder, and major depressive disorder can be treated with medications and counseling. Dr. Peters was less optimistic about treatment for borderline personality disorder, which she stated was difficult to treat and had a poor prognosis. She further stated that borderline personality disorder generally does not respond to medication and, instead, requires ongoing, specialized therapy, for a period of from one to three years, with a minimum of six months to a year of treatment with a single therapist in order to achieve any meaningful results.[7]
 {¶ 26} According to Dr. Peters, the consequences for one diagnosed with borderline personality disorder who does not receive the appropriate treatment would generally include the repetition of the same patterns of behavior, without a lot of insight into or understanding about the causes of that behavior.
 {¶ 27} Regarding appellant's attempts at achieving financial stability, it is undisputed that during the course of this case, appellant studied for and obtained her State Tested Nursing Assistant license. In January 2004, appellant secured a job as a state tested nursing assistant at Hickory Creek nursing home in Hicksville, Ohio. She was terminated fewer than 90 days later, however, when her employer discovered that she was a convicted felon.[8]
 {¶ 28} Appellant then went to work at Parkview Nursing Center. Again, just short of her ninetieth day, she was terminated. This time the reasons for her termination included suspicion of alcohol use, sleeping on the job, and poor performance.[9]
 {¶ 29} Two weeks later, appellant secured a job at Great Lakes nursing home in Toledo, Ohio, where she worked until shortly before the December hearings. Appellant stated that she quit that job because she had no driver's license and, therefore, could not get to work.[10] She also admitted, however, that at the time she left, her employer had called regarding her felonies.
 {¶ 30} At the time of the permanent custody hearings, appellant was employed at Bob Evans restaurant, where she claimed to have worked for a period of approximately three months. In addition, she was attending college courses in pursuit of a nursing degree.
 {¶ 31} By appellant's own admission, however, she had not made regular child support payments, or had she reported her employment to the agency, as was required under the case plan. At the time of the hearings, she was delinquent in her child support obligation by more than $4,000, having not made any payment towards that obligation since July 2004. In addition, appellant, who had recently been evicted from one residence, was delinquent in her obligations to her current landlord.
 {¶ 32} Evidence adduced at the hearings also revealed much about appellant's criminal history. With more than 15 charges, dating from as far back as 1988 to as recently as the time of the hearings, appellant has had convictions and has served jail time — primarily for theft offenses and for probation violations — in Ohio, Indiana, and Michigan.
 {¶ 33} Appellant has, at times, involved her children in the commission of her offenses. Not only has she stolen in their presence, she has encouraged and secured their help in doing the same.
 {¶ 34} Appellant's Ohio parole officers, Steve Elwood and Michael Burkhart, testified that appellant routinely violates her probation conditions by lying to her supervising officer, refusing to abide by specific no contact orders, having alcohol in her residence, committing new offenses, changing residences without permission, failing to notify her supervising officer of her changes of employment, and operating a motor vehicle without a license.
 {¶ 35} In September 2004, appellant spent one night in jail for violating her probation by having associations with a co-defendant. And in November 2004, she was sentenced to serve 90 days under house arrest for repeated probation violations. On December 16, 2004, appellant was again incarcerated — this time for a period of several days — for violating her probation by driving without a license.
 {¶ 36} With respect to the children, the record contains substantial evidence concerning their respective preferences for placement. As indicated above, the children had continuously been in foster care since July 2002. All three remained in the custody of foster parents Mr. and Mrs. C. from August 2002 through May 2003. On May 30, 2003, Dalton was moved to the home of Mr. and Mrs. W. And in August 2003, Dylan, too, was moved to the W. home.[11] Finally, in July 2004, Dylan was moved to the home of Mr. and Mrs. H.[12]
 {¶ 37} Social worker Kime testified that all of the children are currently doing well in their placements. They feel they are safe and have stability. Each of the children requested during in camera discussions that they be permitted to remain in their current homes and not be returned to appellant's custody.
 {¶ 38} Marcia Gilmer, the court appointed special advocate/guardian ad litem ("CASA/GAL"), also testified as to the children's wishes to remain with their foster families and, if possible, to be adopted by them. Gilmer has been the CASA/GAL for the children since February 2002. According to her testimony, the children's biggest fear about being returned to appellant was that she would go back to jail and the foster care process would begin all over again.
 {¶ 39} On February 16, 2005, the trial court issued a judgment entry granting the agency's motion for permanent custody. It is this from this judgment that appellant appeals, setting forth the following assignments of error:
 {¶ 40} I. "THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE WILLIAMS COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES AS THE DECISION WAS AGAINST THE MAINIFEST WEIGHT OF THE EVIDENCE."
 {¶ 41} II. "THE TRIAL COURT COMMITTED PLAIN ERROR IN NOT PROVIDING THE CHILDREN WITH COUNSEL THROUGHOUT THE TERMINATION OF PARENTAL RIGHTS PROCEEDING."
 {¶ 42} III. "THE TRIAL COURT ERRED IN RELYING ON THE FACT THAT THE CHILDREN HAD BEEN IN THE TEMPORARY CUSTODY OF THE WILLIAMS COUNTY DEPARTMENT OF CHILD AND FAMILY SERVICES FOR TWELVE MONTHS OUT OF THE PAST TWENTY-TWO MONTHS IN GRANTING PERMANENT CUSTODY TO THE AGENCY."
 {¶ 43} A court deciding whether to award permanent custody must undertake the following two-part analysis: (1) first, it must determine, by clear and convincing evidence, whether any of the criteria set forth at R.C. 2151.414(B)(1) apply; (2) if the answer is in the affirmative, the trial court must then determine — again, by clear and convincing evidence — whether an award of permanent custody is in the best interest of the child, pursuant to R.C. 2151.414(D).
 {¶ 44} The R.C. 2151.414(B)(1) criteria are as follows:
 {¶ 45} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 46} "(b) The child is abandoned.
 {¶ 47} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 48} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 49} In the instant case, the trial court stated in its conclusions of law: (1) that the children could not be placed with either parent within a reasonable time and that the children should not be placed with either parent; and (2) that the children had been in the temporary custody of the agency for 12 or more months out of the past 22 months. Thus, the conclusions of the trial court indicate that both R.C. 2151.414(B)(1)(a) and (B)(1)(d) apply herein.
 {¶ 50} In reviewing the trial court's determination that the children could not be placed with either parent within a reasonable time and should not be placed with them, pursuant to R.C. 2151.414(B)(1)(a), we look to R.C. 2151.414(E), which provides 16 factors that a court is to consider in making that determination. If a trial court, after considering all relevant evidence, finds by clear and convincing evidence that one or more of those factors exist, the court is required to enter such a finding. R.C. 2151.414(E).
 {¶ 51} Here, the trial court found four of the R.C.2151.414(E) factors to exist, specifically those enumerated at R.C. 2151.414(E)(1), (2), (4), and (13), which are set forth as follows:
 {¶ 52} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 53} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section2151.353 [2151.35.3] of the Revised Code;
 {¶ 54} "* * *
 {¶ 55} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; [and]
 {¶ 56} "* * *
 {¶ 57} "(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child."
 {¶ 58} Appellant argues in her first assignment of error that the trial court's decision with respect to each of those factors was against the manifest weight of the evidence.
 {¶ 59} A court's decision to terminate parental rights will not be reversed as being against the manifest weight of the evidence as long as the record contains competent credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established. In re S.
(1995), 102 Ohio App.3d 338, 345; Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 60} Issues involving the weight of the evidence and the credibility of witnesses are primarily for the trier of fact. As the court explained in Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80: "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."
 {¶ 61} Looking first to R.C. 2151.414(E)(1), it is appellant's contention that the agency failed to show that it used reasonable case planning or diligent efforts to remedy the problems that initially caused the children to be placed outside the home. As revealed in the record, the problems that initially caused appellant's children to be placed outside her home included — in addition to the obvious problem of appellant's incarceration — various mental health issues, long-term financial instability, criminal tendencies, and a lack of parenting skills.
 {¶ 62} The amended case plan sought to address these issues through drug and alcohol assessments, parenting classes, anger management for appellant's husband, psychological evaluation and treatment, individual therapy, promotion of financial stability, and participation in the children's therapy programs. There is no question but that each of the goals set forth in the amended case plan were formulated to assist appellant in reunifying the family.
 {¶ 63} In an effort to help advance these goals, the agency referred Robert Q. for anger management classes and referred appellant for psychological evaluation and therapy. The agency also assisted in arranging counseling services for the children and visitations for the family.
 {¶ 64} Despite the agency's efforts, appellant failed to complete many of the case plan goals. She failed to complete parenting classes and failed to follow through with the recommendation made after her psychological evaluation. She was also unable to maintain financial stability. Robert Q. was likewise unsuccessful to the extent that he failed to complete parenting classes and anger management classes.
 {¶ 65} Although appellant was given the opportunity to complete the case plan objectives, the agency's ability to help was significantly reduced because of appellant's repeated incarcerations. By the time appellant was released from incarceration in December 2003, her children had been in the care of the agency for nearly 18 months, with appellant having spent 12 of those 18 months in incarceration.
 {¶ 66} Appellant argues that the agency did not use reasonable case planning when, after approximately seven months, it abandoned the reunification plan with appellant and began focusing on an interstate placement of the children with Terry L. It should be recalled that the reunification plan was established in May 2003, following appellant's release from prison in Indiana. The plan had been in effect for only five months when appellant was again incarcerated in October 2003, on the holder out of Indiana. At that point, the possibility existed that appellant would be serving more time in Indiana. In addition, appellant was under indictment for felony theft in Ohio. We find that under those circumstances, it was entirely reasonable for the agency to change the focus of its case plan placement from appellant's home to Terry L.'s home.
 {¶ 67} The record is clear in this case that the agency's case planning was reasonable and its efforts to assist appellant were diligent. Nevertheless, appellant continued to suffer from the same problems that caused the children to be removed. We therefore find that there was sufficient competent credible evidence to support the trial court's finding under R.C.2151.414(E)(1).
 {¶ 68} Although the first part of the two-part R.C.2151.414(B) analysis is entirely satisfied under R.C.2151.414(B)(1)(a) by the establishment of the single factor set forth at R.C. 2151.414(E)(1), we will continue with the analysis and address the remaining R.C. 2151.414(E) factors that were found by the trial court to exist in this case.
 {¶ 69} Regarding R.C. 2151.414(E)(2), appellant acknowledges that she suffers from a mental illness, but denies that the mental illness is so severe as to render her unable to provide an adequate, stable home for the children at the present time or within one year of the hearing. Appellant states that the trial court acted in error when relying on this factor, because "there was no testimony given or even elicited from the psychologist who evaluated the appellant as to whether appellant's disorders were so severe as to make her incapable of providing an adequate, stable home for the children."
 {¶ 70} The trial court based its finding with respect to R.C.2151.414(E)(2) upon testimony by Dr. Peters and upon other evidence tending to show appellant's failure to follow through with recommended counseling and therapy. As indicated above, Dr. Peters diagnosed four separate conditions: post-traumatic stress disorder, generalized anxiety disorder, major depressive disorder, and borderline personality disorder. She stated that the first three conditions may be controlled by appropriate counseling and medication, but that borderline personality disorder required more intensive treatment, in the form of long-term, specialized therapy. Dr. Peters further opined that in order for appellant to make any significant progress with respect to her borderline personality disorder, appellant would need to treat consistently with a single counselor for a minimum of six months, and that complete treatment of the disorder would require treatment over a period of from one to three years.
 {¶ 71} The record reveals that appellant failed to consistently use any therapist or counselor in the year and a half after the initial recommendation was made. Thus, on the basis of Dr. Peters' testimony, the trial court could reasonably have concluded that appellant had not received any meaningful treatment for borderline personality disorder, and that any mental health issues relating to that disorder were likely to continue for a period in excess of one year.
 {¶ 72} The evidence falls short, however, with respect to the question of whether appellant's disorders were so severe as to render her incapable of providing an adequate, stable home for her children. Although Dr. Peters did opine that, left untreated, one suffering from borderline personality disorder is likely to repeat the same patterns of behavior without a lot of insight into or understanding about the causes of that behavior, there was no specific discussion of what those behavior patterns might be or how they might impact appellant's ability to care for her children. As a result of these deficiencies in the evidence, we find that the trial court erred in its finding with respect to R.C. 2151.414(E)(2), in that such finding is not supported by competent credible evidence.
 {¶ 73} Finally, we turn to the factor set forth at R.C.2151.414(E)(4). Appellant concedes that she is behind in her child support obligation to the agency, but states that the delinquency is due to ongoing financial difficulties that she and her husband have faced.
 {¶ 74} Appellant's child support obligation was $116 per month, per child. The evidence is undisputed that although appellant was actively employed during much of 2004, that year she made only three payments toward her child support obligation.
 {¶ 75} At the December hearing, appellant testified that she had been working at Bob Evans restaurant for three months, making approximately $300 per week. She also received $440 per month in child support for her other children. At the same time, her husband was receiving $426 every two weeks in unemployment compensation. Thus, the family income amounted to more than $2,500 per month. Nevertheless, appellant admitted that she was not paying anything in child support.
 {¶ 76} Because there was competent and credible evidence to show that appellant had the ability to pay support for most of 2004, but nevertheless failed to do so, it is our determination that the trial court's finding under R.C. 2151.414(E)(4) was justified.[13]
 {¶ 77} Finally, regarding R.C. 2151.414(E)(13), appellant states that the agency failed to show that appellant's incarcerations prevented her from providing care for her children.
 {¶ 78} The record in this case clearly demonstrates that appellant is a career criminal, who has spent significant amounts of time in incarceration as a result of her offenses. At the time the agency filed its permanent custody motion in July 2004, appellant had spent 12 of the previous 24 months in incarceration.
 {¶ 79} Although appellant claimed at the permanent custody hearing to have stopped engaging in criminal behavior, she acknowledged her continuing inability to comply with the terms and conditions of her probation.
 {¶ 80} Based on the foregoing, we find that the trial court had before it competent and credible evidence that appellant's repeated incarcerations prevented her from providing adequate care for the children, pursuant to R.C. 2151.414(E)(13).
 {¶ 81} Because not just one, but three of the four R.C.2151.414(E) factors that were relied upon by the trial court are supported by clear and convincing evidence, we find that the trial court's decision pursuant to R.C. 2151.414(B)(1)(a) — that the children could not be placed with either parent within a reasonable time and should not be placed with them — is more than sufficiently supported by the record. Accordingly, appellant's first assignment of error is not well-taken.
 {¶ 82} We next address appellant's third assignment of error, wherein she claims that the trial court, in making the permanent custody determination, erred when it relied on the fact that the children had been in the temporary custody of the agency for 12 out of the past 22 months.
 {¶ 83} We note at the outset that because we found adequate support for the trial court's determination with respect to R.C .2151.414(B)(1)(a), any question about the propriety of the trial court's determination with respect to R.C. 2151.414(B)(1)(d) is necessarily moot. Nevertheless, we will briefly consider appellant's claim.
 {¶ 84} Appellant does not dispute the fact that the children had been in the temporary custody of the agency for 12 or more months out of the past 22 months. Rather, she disputes that such is an appropriate basis for termination of parental rights.
 {¶ 85} Unfortunately for appellant, R.C. 2151.414(B)(1)(d) is a statutorily authorized basis for termination of parental rights. And, in this case, it is an additional, merely cumulative, reason for termination of appellant's parental rights. Appellant's third assignment of error is therefore found not well-taken.
 {¶ 86} Finally, we consider appellant's second assignment of error, wherein appellant argues that the trial court committed plain error in not providing the children with counsel throughout the termination of parental rights proceeding.
 {¶ 87} A child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding, and, in that capacity, may have a right to counsel. See In re Williams, 101 Ohio St.3d 398. To determine whether a child has a right to counsel, a court must decide whether the child actually needs independent counsel, "taking into account the maturity of the child and the possibility of the child's guardian ad litem being appointed to represent the child". Id.; see also, In re K., 8th Dist. No. 83410, 2004-Ohio-4629. Although a guardian ad litem can serve in the dual roles of advocate and guardian, the Williams court recognized the possibility of a fundamental conflict where the guardian's recommendation as to what would be in the child's best interest runs counter to the wishes of the child. Id. at ¶ 18.
 {¶ 88} In this case, the recommendations of CASA/GAL Marcia Gilmer were consistent with the wishes of the children, as expressed to her by the children and as expressed by the children directly to the court at the in camera review. Because there was no conflict, it was not necessary for the trial court to appoint separate counsel to represent the interests of the children. Accordingly, appellant's second assignment of error is not well-taken.
 {¶ 89} On consideration whereof, the judgment of the Williams County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the costs of this appeal for which sum judgment is rendered against appellant on behalf of Williams County and for which execution is awarded.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Skow, J., concur.
Singer, P.J., concurs and writes separately.
[1] According to social worker Kime, the children were removed from the second foster home after Dylan attempted to perpetrate sexual acts on a three-year old biological daughter of the family. As explained infra, Dalton and Dylan were subsequently moved from the C.s' home to several other foster homes, until they were able to find suitable long-term placement.
[2] After appellant rejected therapy with Baldwin, the agency provided her with several other recommendations for therapy.
[3] The agency determined that the visits should be supervised, due to appellant's earlier conduct during telephone conversations with her children while she was in prison. Specifically, appellant had made inappropriate promises to the effect that she and the children would soon be reunited. When the promises were not kept, the children reacted with anger and disappointment.
[4] Evidence introduced at the hearings revealed that the children frequently exhibited behavioral problems immediately before and after having contact with appellant, including bed wetting, fighting with other children, disobedience, running away, and physical illness. The children's therapists both noted that once the visits stopped, so did the negative behaviors.
[5] Although appellant was informed that she could communicate with the children by letter, she failed to do so until September 2004, after the agency had filed its motion for permanent custody.
[6] Review of appellant's medical records reveals that appellant was only present for the last 15 minutes of her second session with Baldwin.
[7] Therapists Huntingford and Keister each testified that their limited involvement with appellant would not have been enough to impact her treatment.
[8] It took the employer some time to make the discovery about appellant's criminal history, because appellant had lied about that history in her employment application.
[9] Although appellant denies using alcohol — she claims her employer mistook the smell of her cough medicine for alcohol — she does admit to sleeping on the job and to poor performance.
[10] As will be discussed infra, at page 11, although appellant does not have a driver's license, she does drive, in knowing violation of the terms and conditions of her probation.
[11] Both boys were removed from the C.s' home for displaying inappropriate sexual behaviors toward another child in the home.
[12] According to Mrs. W., Dylan was removed from her home after acquiring eating disorders and becoming more violent towards other children in the home.
[13] Although appellant's child support obligation began in July 2002, because appellant spent much of the next year and a half in incarceration — and was, therefore, presumably unable to make any payments toward this obligation — we chose to focus our analysis on the year 2004.