DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment by the Lucas County Court of Common Pleas, Juvenile Division, which terminated appellant-mother Jessica G.'s parental rights to Cam'Ron G., and granted permanent custody to appellee, Lucas County Children's Services Board ("agency"). For the reasons that follow, we affirm the judgment of the trial court. *Page 2 
 {¶ 2} Appellant, Jessica G., is the biological mother of Cam'Ron G., who was born in 2004. Eugene O. is the biological father of the child.
 {¶ 3} The agency first became involved with this family in response to a referral received in late December 2004, just days after Cam'Ron's birth. Pursuant to the results of the initial investigation conducted by the agency, a complaint in dependency and neglect was filed. Following a shelter care hearing, the trial court ordered that Cam'Ron was to be removed from his mother's care and placed in the temporary custody of the agency.
 {¶ 4} In the shelter care order, the trial court took note of the fact that at the time of Cam'Ron's birth, appellant, who was just 16 years old, tested positive for cocaine and was involved in drug treatment. The trial court further noted the existence of a domestic violence problem between appellant and Eugene O. (a.k.a. "Tony").
 {¶ 5} At an adjudicatory/dispositional hearing held on February 15, 2005, Cam'Ron was found to be both a dependent and neglected child, as defined by the Ohio Revised Code. A case plan, with an initial goal of reunification was approved. Under the case plan, Jessica G. was required to participate in various services, and to obtain and maintain employment and stable independent housing. The case plan, first filed on January 28, 2005, was in place in this case for more than two years.
 {¶ 6} On November 29, 2005, the agency filed a motion seeking an extension of its temporary custody, which extension was granted by the trial court at a hearing held on December 19, 2005. A second extension was granted on July 31, 2006. A motion to set *Page 3 
aside this second extension was filed and the matter was heard on October 23, 2006, at which point an agreement was reached that the motion to set aside would be granted and the matter of extension would be continued for hearing on December 11, 2006. The agency filed its motion for permanent custody on December 1, 2006. A dispositional hearing was commenced on February 13, 2006 and concluded on February 16, 2007. At the hearing, the following evidence was adduced.
 {¶ 7} Jessica G.'s caseworker, Carrie Vivenstadt, testified that she had been assigned to the case for two years, and that she had monitored the case plan of services. For Jessica G., these services included an alcohol and drug assessment with follow through on recommendations, parenting instruction, continued counseling for depression and for concerns regarding her home life, and, later, additional counseling specifically directed to domestic violence. Vivenstadt testified as follows regarding Jessica G.'s need for the services: In addition to testing positive for cocaine at the time of Cam'Ron's birth, Jessica G. had used marijuana and drunk alcoholic beverages since the age of seven, when her mother introduced her to intoxicants. Jessica G. had reported that she did not feel she had healthy relationships with her family and did not feel that she had healthy support. As a result of her own mother's unhealthy lifestyle, in 1996, Jessica G. was adopted by her maternal grandparents.
 {¶ 8} Jessica G. began receiving counseling in 2001, when it was ordered as part of a delinquency case. That counseling, provided by Family Services, continued until the counseling portion of the instant case was closed in May 2006. Vivenstadt stated that she *Page 4 
was not satisfied that the counseling component had been completed. In her opinion, Jessica G. still needed to learn how to deal with her depression diagnosis and how to have healthy relationships. In November 2005, as a result of ongoing concerns about Jessica G.'s involvement with violent men, the specific service of domestic violence counseling was added to her case plan.
 {¶ 9} Vivenstadt testified that she became aware that domestic violence was a continuing issue after Jessica G. had admitted to its occurrence on a couple of occasions. According to Vivenstadt, Jessica G. had talked "in-depth" about her domestically violent relationship with Eugene O., and had talked, as well, about having terminated subsequent relationships with other men after those men started showing signs of domestic violence or after they had "laid their hands on her." Vivenstadt additionally testified that even at the time of trial, there were indications that Jessica G. was involved with a man who was domestically violent with her.
 {¶ 10} Vivenstadt testified that although Jessica G. did complete both the parenting and drug treatment components of the case plan, she was terminated unsuccessfully from Family Services counseling, and, at the time of trial, had not yet completed her specific treatment for domestic violence.
 {¶ 11} Vivenstadt stated that Antoine M. was Jessica G.'s most recent boyfriend. Vivenstadt learned of him in February 2006, during an unannounced home visit, at which time Antoine M., although introduced to Vivenstadt, refused to speak with her. Jessica G. told Vivenstadt that he had hit her on more than one occasion, and Vivenstadt stated *Page 5 
that she saw marks on Jessica G. indicating that she had been struck, including hand marks on her left arm and a black eye, bruising and scratches on her face. In addition, Jessica G. admitted to Vivenstadt that she had bruising and scratching on her legs, and that Antoine M. had caused those injuries. When the issue of domestic violence with Antoine M. was brought up during a November 2006 staffing, Jessica G. reported that she always seemed to choose domestically violent men because that was all she knew.
 {¶ 12} Prior to November 2006, Jessica G. and Antoine M. lived together in her grandfather's home. Although Jessica G. secured her own housing in November 2006, Antoine M. remained in the grandfather's home. And although Jessica G. denies that she has any contact with Antoine M., the evidence is undisputed that she visits the grandfather's home at least once a week.
 {¶ 13} The evidence is likewise undisputed that Jessica G. had been involved with a total of four violent men during the pendency of this case. Vivenstadt testified that she had contact with one of those men, Cam'Ron's biological father, Eugene O., in March 2006, when she saw him in court with his girlfriend. He commented to Vivenstadt that sometimes he had to smack his girlfriend around just like he did to Jessica G., because his girlfriend was as dumb as Jessica G.
 {¶ 14} Vivenstadt testified that Jessica G. had scheduled visits with her child two times a week. Originally, those visits were scheduled to take place at the agency and at the East Toledo Family Center. Beginning in November 2006, the schedule was changed, so that all visits were to take place at the agency. Vivenstadt requested the *Page 6 
change after she discovered that Antoine M. was transporting Jessica G. to visits and was possibly having contact with Cam'Ron in the parking lot.
 {¶ 15} Cam'Ron's biological father, for his part, although repeatedly requested to undergo diagnostic assessment to determine his need for services — including domestic violence treatment, anger management treatment, individual counseling, and alcohol and drug treatment — never complied with these requests. Nor did he ever pay any court-ordered child support. Although he initially participated in visitations with his son, those visits were ultimately terminated on or about March 2006, due to his lack of participation.
 {¶ 16} According to Vivenstadt, two parties are interested in adopting Cam'Ron. The first is the foster parent who has had placement of him, and the other is an alleged paternal aunt. Vivenstadt testified that she believed an award of permanent custody to the agency would be in Cam'Ron's best interest. Her concern was that if Cam'Ron were returned to his mother he would be at risk of harm, either physical or emotional, from the domestic violence in Jessica G.'s life.
 {¶ 17} Witness Loretta Kirk testified that she had supervised Jessica G.'s visits at the East Toledo Family Center during 2005 and half of 2006, and that she had seen Antoine M. pick Jessica G. up from those visits three or four times. According to Kirk, Jessica G. told her on one occasion that Antoine M. had taken her cell phone and would not give it back, and that when she did try to get it back, he pushed her. In July 2006, Kirk became a security officer at the agency. In October 2006, she saw Jessica G. at the agency and noticed that she had a black eye. Jessica G. told her that it happened when *Page 7 
she and Antoine M. had gotten into a fight. Kirk testified that as recently as three weeks before trial she had seen Antoine M. pick Jessica G. up from a visit at the agency.
 {¶ 18} Sharon Fitzgerald, guardian ad litem for the child, who at the time of trial had been on the case for about a month, also testified. After summarizing the investigation she had done, she stated that a couple of weeks before trial she had had a conversation with Jessica G., and that Jessica G. had denied that there was any domestic violence with Antoine M. and had stated that he was just a friend. Fitzgerald was unable to locate Antoine M. Fitzgerald said that her impression of Jessica G. was that, like many 18-year olds, she was not open to taking advice from adults who tried to help her, and that, in this case taking such advice was critical, because she had had such poor parenting models growing up.
 {¶ 19} The trial court, upon consideration of the evidence presented at the dispositional hearing, ultimately awarded permanent custody of that above-named minor child to the agency. The court found that there was clear and convincing evidence to support its determination under R.C. 2151.414(E)(1), as to the mother, and under R.C. 2151.414(E)(1), (4), (10), and (14), as to the father. The court further found that the minor child had been in the temporary custody of the agency for 12 or more months of a consecutive 22 month period. The court found this fact to be relevant to a best interest finding, under R.C. 2151.414(D)(3), and additionally determined that it served as a separate and sufficient ground for the award of permanent custody, pursuant to R.C.2151.414(B)(1)(d). *Page 8 
 {¶ 20} In explaining its ruling, the trial court expressed its concern "that the mother of this child was to address her propensity for involvement in violent relationships, and yet, at or about the time of the permanent custody trial, more than two years after the case was initially filed, citing such an issue, she had been in such a relationship yet again." In addition, the court found that "[reasonable efforts were made to prevent the need for out of home placement in that the parents were offered case plan services, including mental health, parenting instruction, substance abuse and caseworker services," but that those efforts were not sufficient to avoid continued removal from the family home. Finally, the court found that reasonable efforts were made to finalize a permanency plan for the child — first in the form of offering services toward possible reunification with a parent, and when that was not possible, in the form of a plan for adoption.
 {¶ 21} The judgment entry in this matter was filed and journalized on April 5, 2007. Appellant timely filed this appeal, raising the following assignments of error:
 {¶ 22} I. "THE TRIAL COURT ERRED IN FINDING THAT THE LUCAS COUNTY CHILDREN'S SERVICES BOARD HAD MADE A REASONABLE EFFORT TO REUNIFY THE MINOR CHILD WITH THE APPELLANT."
 {¶ 23} II. "THE TRIAL COURT ERRED IN GRANTING LUCAS COUNTY CHILDREN'S SERVICES BOARD'S MOTION FOR PERMANENT CUSTODY AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE." *Page 9 
 {¶ 24} In her first assignment of error, Jessica G. challenges the permanent custody award on grounds that the agency did not make "a reasonable effort to reunify." But her arguments in support of this assignment of error do not challenge the case plan services or the efforts of the agency to implement services that would lead to reunification. Instead, her argument appears to be that because she "substantially completed her case plan services" and "was capable of and actually did make significant changes in her life," the agency should have returned her child. Since the child was not returned to her, the argument continues, the agency did not exercise reasonable or diligent efforts. In effect, this argument is not different from the argument in her second assignment of error, wherein she states that the permanent custody decision is against the weight of the evidence. Because the two assignments of error involve overlapping issues, they will be considered together in our analysis.
 {¶ 25} A court's decision to terminate parental rights will not be reversed as being against the manifest weight of the evidence as long as the record contains competent credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established.In re S. (1995), 102 Ohio App.3d 338, 345; Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus; see, also, In the matterof: Amber M, 6th Dist. No. WM-05-003, 2005-Ohio-4172, ¶ 59.
 {¶ 26} Issues involving the weight of the evidence and the credibility of witnesses are primarily for the trier of fact. As the court explained in Seasons Coal Co. v. *Page 10 Cleveland (1984), 10 Ohio St.3d 77: "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id., at 80.
 {¶ 27} R.C. 2151.353 controls the disposition of a child determined to be dependent, neglected or abused. Pursuant to that statute, a court may enter any order of disposition provided for in R.C. 2151.353(A), including an order committing the child to the permanent custody of a public children services agency. But before the court can grant permanent custody of a child to a public services agency the court must determine: (1) that the child cannot be placed with one of his parents within a reasonable time or should not be placed with a parent, pursuant to R.C. 2151.414(E); and (2) that the permanent commitment is in the best interest of the child, pursuant to R.C. 2151.414(D). R.C.2151.353(A)(4); see, also, In the Matter of Carlos R. III, 6th Dist. No. L-07-1194, 2007-Ohio-6358, ¶ 21.
 {¶ 28} R.C. 2151.414(E) provides that a court, in determining whether a child cannot be placed with a parent within a reasonable time or should not be placed with a parent, shall consider all relevant evidence. R.C. 2151.414(E) additionally provides that if the court determines by clear and convincing evidence that any one of sixteen factors listed in the statute exist, the court must find that the child cannot be placed with the parent within a reasonable time or should not be placed with the parent. Id. Those factors include: *Page 11 
 {¶ 29} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 30} "* * *
 {¶ 31} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 {¶ 32} "* * *
 {¶ 33} "(10) The parent has abandoned the child.
 {¶ 34} "* * *
 {¶ 35} "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect. *Page 12 
 {¶ 36} "* * *
 {¶ 37} "(16) Any other factor the court considers relevant." R.C.2151.414(E).
 {¶ 38} Clear and convincing evidence is that evidence which establishes in the mind of the trier of fact a firm conviction as to the allegations sought to be proven. Cross v. Ledford (1954),161 Ohio St. 469, syllabus at paragraph three.
 {¶ 39} With respect to determining the best interest of the child, R.C. 2151.414(D) directs that the court shall consider all relevant factors, including:
 {¶ 40} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 41} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 42} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 43} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 44} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." *Page 13 
 {¶ 45} Upon a thorough review of the record in this case, we conclude that the trial court's determinations that Cam'Ron could not be placed with his mother within a reasonable time and should not be placed with her, and that permanent custody was in Cam'Ron's best interest, were supported by clear and convincing evidence.
 {¶ 46} In the instant case, Jessica G. challenges only the trial court's finding, made pursuant to R.C. 2151.414(E)(1), that she failed continuously and repeatedly to substantially remedy the conditions causing Cam'Ron to be placed outside of his home. As indicated above, when Cam'Ron was removed from the home, Jessica G. had problems with drug abuse and with domestic violence involving the baby's father. Although the drug use problem was successfully addressed, the domestic violence problem clearly was not. Throughout the case, Jessica G. continued to have relationships with violent men. In addition, the domestic violence aspect of her counseling was never successfully completed. We note that failure to complete significant aspects of a case plan, despite opportunities to do so, is itself a sufficient basis for terminating parental rights. In re G.S., 10th Dist. No. 05AP-1321,2006-Ohio-2530, ¶ 15. Based upon the foregoing, we find that there was clear and convincing evidence to support the trial court's findings under R.C. 2151.414(E)(1) that Jessica G. failed to remedy the conditions that caused Cam'Ron to be removed from the family home.
 {¶ 47} Arguing against this conclusion, Jessica G. asserts that the agency failed to "articulate any actual incidents in which the minor child had been harmed or was in jeopardy of being harmed by [Jessica G.] or anyone else." We note that the law does not *Page 14 
require that the child suffer physical or emotional damage before a parent's rights can be terminated. Jessica G.'s argument, which suggests to the contrary, is without merit.
 {¶ 48} Jessica G. next argues that because she reached adulthood just some seven months before trial, she was not afforded sufficient time to remedy her problems. We are unpersuaded by this argument. The law provides no special treatment for mothers who have children before they become adults.
 {¶ 49} Finally, Jessica G. argues that "[m]ere speculation that [her] future relationships may be violent does not meet the `clear and convincing' standard of proof required in these types of cases." First, the record clearly establishes, beyond "mere speculation", a longstanding and persistent pattern on Jessica G.'s part of entering into violent relationships. Also, the evidence is undisputed that Jessica G. never successfully completed her domestic violence counseling. As indicated above, this failure, involving a critical aspect of her case plan, is itself a sufficient basis for terminating her parental rights. See, In re G.S., 10th Dist. No. 05AP-1321, supra.
 {¶ 50} For all of the foregoing reasons, appellant's assignments of error are found not well-taken and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED. *Page 15 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., William J. Skow, J., concur. *Page 1