[Cite as *In re D.C.*, 2017-Ohio-8728.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re D.C.                                    Court of Appeals No. L-17-1121

                                              Trial Court No. JC 16259449

                                              **DECISION AND JUDGMENT**

                                              Decided: November 28, 2017

* * * * *

Adam H. Houser, for appellant.

Angela Y. Russell, for appellee.

* * * * *

**SINGER, J.**

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common

Pleas, Juvenile Division, that terminated the parental rights of appellant, J.C., the mother

of D.C. ("child 3"), and granted permanent custody of child 3 to appellee, Lucas County

Children Services ("appellee" or "agency"). For the reasons that follow, we affirm the

judgment.

**{¶ 2}** Appellant set forth two assignments of error:

1. Mother Did Prove by Clear and Convincing Evidence That She Did Rectify the Conditions That Cause The Termination of Parental Rights From the Previous Case and She Can Provide a Legally Secure Permanent Placement And Adequate Care For The Health, Welfare, and Safety of the child[.]

2. The Court Failed to grant legal custody of the child to the non-relative placement that had an approved home study and had a signed memorandum of legal understanding.

### Background

**{¶ 3}** Appellant is the biological mother of three children by two different fathers. The youngest child is the subject of a permanent custody award in this appeal. Appellant's children include: J.T.-W., born in May 2004 ("child 1"), De.H., born in February 2010 ("child 2"), and child 3. M.W. is the biological father of child 1, and the biological father of child 2 and child 3 is D.H. ("father").

**{¶ 4}** The record shows appellee became involved with appellant in July 2010, when child 2, who was five months old, was taken to the hospital and diagnosed with an orbital fracture and subdural hematoma. The emergency room physician determined child 2's injuries were "non-accidental and likely physical abuse." Father was subsequently indicted on one count of endangering children, a felony of the second

2.

degree. Father entered a no contest plea to the charge and was found guilty. In November 2011, father was sentenced to three years in prison.

{¶ 5} In December 2011, appellee moved for permanent custody of child 1 and child 2. The matter was heard over several days. On November 21, 2012, the trial court issued a judgment entry granting permanent custody of the children to appellee. The entry includes a finding that "[Mother's] continual denial of [father's] infliction of injuries to [child 2], despite the medical and legal evidence to the contrary, places the children at high risk if placed in her care." Mother appealed and we affirmed. *See In re J.T.-W.*, 6th Dist. Lucas No. L-12-1353, 2013-Ohio-3901.

{¶ 6} In December 2016, appellant gave birth to child 3. Appellee took custody of child 3 upon her discharge from the hospital, and child 3 was placed in a foster home.

{¶ 7} On December 8, 2016, a complaint in dependency and neglect was filed regarding child 3. That same day, a shelter care hearing was held and appellee was awarded interim temporary custody of child 3. Appellant attended that hearing.

{¶ 8} Hearings on the matter were held before the trial court on April 5 and 7, 2017. On April 12, 2017, the court announced its decision, awarding permanent custody of child 3 to appellee. On May 4, 2017, in a judgment entry, the court granted permanent custody of child 3 to appellee. Appellant appealed. Father did not appeal and is not a party to this appeal.

3.

**The Hearing**

{¶ 9} Appellee called numerous witnesses at the adjudication and disposition hearings, including a social worker, caseworker and guardian ad litem ("GAL"). Appellant testified and called several witnesses to testify. The testimony which is relevant to appellant's appeal is summarized below.

**Jennifer Wilhelm**

{¶ 10} Wilhelm is a social worker who worked at St. Luke's Hospital in December 2016, when she received a referral for a consult for psychosocial issues for appellant. Wilhelm testified she met with appellant on December 5, 2016, to conduct an assessment. Wilhelm asked appellant questions and took notes of appellant's answers. Right after the meeting, Wilhelm documented what transpired in progress notes. At the hearing, Wilhelm read from the progress notes, including "Patient resides in an apartment * * * and lives with the baby's father. The patient reports losing custody of two prior children several years ago to CSB but would not elaborate. * * * Patient * * * reports her significant other is now happy because he has a baby girl." Wilhelm testified it was her understanding that appellant and the baby's father were in a relationship together.

**Caseworker Kari Vebenstad**

{¶ 11} Vebenstad, an ongoing caseworker for appellee, testified she received a referral in December 2016, with respect to child 3. Vebenstad met with appellant but appellant did not define her relationship with father, nor did appellant state whether or not she lived with father. Vebenstad never went to appellant's residence and was told not

4.

to go there because father was listed as a red flag in appellee's system due to his violence, and there were concerns father lived at appellant's residence.

{¶ 12} Vebenstad observed appellant's visits with child 3 at the agency and noted appellant brought supplies with her and was very attentive to child 3 and was very active and involved with child 3. Vebenstad also observed father's visits with child 3 at the agency and noted he was very attentive to child 3, and he would hold her, rock her and feed her. Vebenstad believed appellant and father had contact with each other because at one of father's visits with child 3, it appeared that father brought some of the same supplies that appellant had brought with her on her visits with child 3.

{¶ 13} Vebenstad testified she had very recently spoken to father who said he had a lot going on in his life and he believed he was going to sign off on child 3.

{¶ 14} Vebenstad recognized that appellant is employed and has appropriate housing. Vebenstad also acknowledged appellant had, in the previous case, successfully completed case plan services, including domestic violence victim service. However, Vebenstad noted appellant continued to have a relationship and contact with father while he was in prison and after he was released from prison. Vebenstad discussed how appellant and father were both arrested in February 2016, following an altercation, and father was charged with domestic violence.

{¶ 15} Vebenstad opined it was in child 3's best interest for appellee to have legal and permanent custody based on appellant and father's history with appellee and their

5.

continued relationship and contact. Vebenstad insisted appellant did not make a lifestyle change, and Vebenstad thought appellant lacked insight and the ability to protect child 3.

{¶ 16} Vebenstad understood appellant suggested a family friend, M.C., as a potential placement for child 3. Vebenstad spoke to M.C. and M.C. indicated she did not have a relationship with appellant. Vebenstad testified a home study of M.C.'s home was ordered, conducted and approved, and a home study of the adoptive parents of child 2's home was also being considered by appellee. Vebenstad said child 3 is doing very well at her foster home and the foster parent would consider adopting child 3.

## GAL Judith Orphey

{¶ 17} Orphey testified she was the GAL appointed to represent appellant's children in the 2010 case, and she was also the GAL appointed to represent child 3 in this case.

{¶ 18} Orphey undertook an independent investigation to determine child 3's best interests. Orphey observed child 3 at her foster home, talked to the current caseworker, watched child 3's visits with appellant and reviewed records from the agency.

{¶ 19} Orphey testified child 3 was very clean at the foster home and did not smell. Orphey noted child 3 was very tiny. The foster mother indicated to Orphey that she would be interested in adopting child 3 if the court made the decision for permanent custody.

{¶ 20} Orphey testified she had the same concerns in the 2010 case that she has now, namely the relationship between appellant and father. Although appellant

6.

completed all of her services in the 2010 case, Orphey stated she felt, as did the caseworker and the court, that the children could not be returned to appellant because of appellant's continued relationship with father, his violence and lack of change. Orphey was greatly concerned with appellant's testimony that appellant did not feel that father intentionally inflicted the injuries on child 2. Orphey noted that the doctor said it was an inflicted injury to the child, and father was charged with and convicted of the injury, but appellant would not accept that the injuries occurred and that father caused the injuries.

{¶ 21} Orphey also recalled that in the 2010 case, appellant told Orphey, the caseworker, everyone at the agency and the courts that appellant was not in a relationship with father. Orphey described how over 30 hours of telephone conversations between appellant and father were accessed, wherein appellant made statements which led Orphey to believe that appellant was in a relationship with father. Appellant had said she would be waiting for father when he was released from prison and that she would always love father. Appellant had also said she would not have taken child 2 to the hospital when he was injured if she had known all of this stuff was going on.

{¶ 22} Orphey remarked that in this case, appellant is again denying that she is in a relationship with father, but in appellant's Facebook posts, appellant is posting things about father. In addition, Orphey saw appellant and father leaving court together. It was also significant to Orphey that there was a domestic violence incident between appellant and father, and appellant continued to have contact with father. Orphey maintained her belief that appellant and father are in a romantic relationship.

7.

**{¶ 23}** Orphey recommended in her report that permanent custody of child 3 be awarded to appellee for purposes of adoption, as it was in child 3's best interest.

## Sister

**{¶ 24}** K.T. is appellant's 17-year-old sister ("sister"). Sister testified she lives with appellant and has lived with appellant off and on for seven years. Sister lived with appellant when appellee became involved in 2010, and child 1 and child 2 were removed from the home. Sister said she lived with appellant the entire time that appellee was involved, which was 2010-2012. Sister did not recall telling someone from the agency that during that time she lived with her parents. Sister testified father never lived with her and appellant, and father and appellant are not together. Sister did hear appellant talk to father on the phone about child 3 "[a] while ago." Sister stated there were no men's clothes in appellant's closet or dresser.

**{¶ 25}** Sister testified she lived with appellant on February 1, 2016, when the police were called and appellant and father were both arrested, but sister was not at the home at the time of the incident. Sister believed father was arrested because he "put his hands on [appellant]." Sister was surprised to learn that child 3 was conceived after this domestic violence incident.

**{¶ 26}** Sister was at the hospital with appellant when child 3 was born. Sister said father was with appellant during child 3's birth.

8.

**M.C.**

{¶ 27} M.C. testified she has known appellant for about nine or ten years, as appellant's nephew is M.C.'s grandson. M.C. said appellant is a friend of the family and M.C. does not really have a relationship with appellant. M.C. went over to appellant's home once to get some clothes for the baby. M.C. could not remember the baby's name. M.C. has been an at-home daycare provider for Job and Family Services ("JFS") for 25 years.

{¶ 28} M.C. testified she was in court with appellant in December 2016, at a hearing when child 3 was ordered into the interim temporary care of appellee. Shortly thereafter, M.C. met with the GAL at M.C.'s home and also had someone from the agency conduct a home study. M.C. told the GAL that M.C. had only met appellant a few times and did not really know appellant. M.C. stated she was notified that the home study was approved.

**Appellant**

{¶ 29} Appellant testified her sister lived with her off and on for seven years. Appellant said she made the GAL aware that sister lived with her when the case in 2010 opened. Appellant stated father also lived with her in 2010. After child 1 and child 2 were removed from the home, appellant said she would bring her sister to visits with the children. Appellant informed the caseworker that sister stayed with appellant. Appellant admitted father had an altercation with child 1's father at the home of child 1's father.

9.

**{¶ 30}** Appellant testified she knew father injured child 2, but she did not think father intentionally inflicted the injury.

**{¶ 31}** Appellant stated there was never a physical altercation between her and father until February 1, 2016, when "he put his hands on me." Appellant called the police; it was about 4:00 a.m. Appellant and father were both charged with crimes. Appellant admitted she was the victim of father's charge and acknowledged she did not attend any court hearings with respect to that charge. Appellant described her relationship with father at that time as friends, they were not dating, and she had phone, face-to-face and Facebook communication with father. Appellant recognized child 3 was conceived shortly after the February 1, 2016 altercation but she claimed that was the only time she was intimate with father since his release from prison. Appellant described it as "a lapse in judgment. I was lonely, depressed."

**{¶ 32}** Appellant testified on April 1, 2016, she told father she was pregnant, and father moved out of town at the end of April. Father moved to North Carolina with his other children's mother and stayed there until late September or early October 2016. During that time, appellant did not talk to father, as he had changed his phone number. Appellant started dating other people. Appellant was angry with father since he disappeared when she was pregnant.

**{¶ 33}** When father returned to town, appellant had contact with him by phone, about once a week. When child 3 was born in December 2016, father was at the hospital. Since then, appellant has spoken with father on the phone about once a week in regards to

10.

the case and she also talked to him after his visits with child 3. Appellant stated she did not assist father with belongings he could take to visits with child 3. Appellant maintains she is not in an ongoing relationship with father although his mail, such as debt collection letters for his child support, is delivered to her home.

{¶ 34} Appellant stated she is currently in counseling, as she had an assessment which showed she had signs of depression, anxiety and PTSD. Appellant had previously taken domestic violence victims counseling because father had a history of domestic violence. Appellant acknowledged further contact with father could cause risk to her children.

{¶ 35} Appellant attended every visit with child 3 except for the time appellant had court and the flu. Appellant's visits with child 3 were great. Appellant did have some issues with child 3's care in her current placement as child 3 smelled, had a bald spot and flat spot on the back of her head from laying down, and had torticollis because her neck was not supported when she was in her car seat. Appellant was also concerned about child 3's weight and how she was eating as child 3 was so small. When appellant told the caseworker about her concerns, appellant "completely went crazy" and was hollering.

{¶ 36} Appellant said M.C. runs a daycare out of her house and takes good care of appellant's nephew, who lives there. M.C. also has custody of her brother's son. Appellant admitted she had never been in M.C.'s home, but appellant knows the home is appropriate because it is approved by JFS.

11.

**{¶ 37}** Appellant was asked about some Facebook posts, including the following post: "OMG, I can't wait until this DNA test come back. What the fuck a mother fucker gonna say then. And whoever is texting my baby fava from * * * can catch these hands, bitch. Worry about your own miserable life, hoe." Appellant said this post was made after father told her that "somebody text him from anonymous number saying that you going to let her play you again. You are not the father of her baby."

### Trial Court's Decision

**{¶ 38}** In its May 4, 2017 judgment entry, the court found, by clear and convincing evidence under R.C. 2151.353(A)(4), that child 3 could not be placed with either parent within a reasonable time, and pursuant to R.C. 2151.414(D)(1), it was in the child's best interest to grant permanent custody to appellee for adoptive placement. The court further found, pursuant to R.C. 2151.414(E)(11), that the parents had their parental rights to child 3's sibling involuntarily terminated, and the parents failed to show, by clear and convincing evidence, that they can now provide a legally secure permanent placement and adequate care for the health, welfare and safety of child 3.

### The Appeal

### Standard - Permanent Custody

**{¶ 39}** A trial court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. "The underlying rationale of giving

12.

deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Hence, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 40} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6; R.C. 2151.353(A)(4). R.C. 2151.414(B)(1)(a) provides that "the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent." R.C. 2151.414(E) requires a trial court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any one of sixteen factors are met. R.C. 2151.414(E)(1)-(16). R.C. 2151.414(E)(11) places the burden on the parents to essentially rebut a presumption, by clear and convincing evidence, that

13.

because their parental rights were involuntarily terminated as to other children, they are not suitable parents for additional children.

{¶ 41} Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

### Appellant's First Assignment of Error

{¶ 42} Appellant argues she proved, by clear and convincing evidence, that she rectified the conditions which caused her parental rights to be terminated in the previous case. She further contends she can provide a legally secure permanent placement as well as adequate care for the health, welfare and safety of child 3.

{¶ 43} Appellee counters appellant continued to maintain contact and communication with father and still believed father did not intentionally injure child 2. Appellee asserts appellant's circumstances have not changed since she lost her parental rights in 2012, as appellant still lacked insight as to the risk that father posed to her child.

{¶ 44} A review of the record shows appellee has established that appellant's parental rights to child 3's older siblings had been involuntarily terminated. Appellant had the burden of proving, by clear and convincing evidence, that she remedied the condition which caused the termination of her parental rights to her two children in the previous case. The condition which caused the involuntary termination of her parental

14.

rights to her two children in the previous case was appellant's relationship with father because of father's violent history.

{¶ 45} Appellant testified at the hearing that she no longer has a relationship with father, however conflicting evidence was presented regarding appellant and father's relationship and contact. Although appellant said she was just friends with father, the record shows she became pregnant by father shortly after he "put his hands on" her and the couple was arrested. Thereafter, appellant did not follow through to pursue the domestic violence charge against father. When child 3 was born, father was present, then spent the night with appellant at the hospital. The hospital's social worker testified appellant told her that father lived with her. Additional evidence of a relationship between appellant and father included appellant's Facebook page, as well as appellant's testimony that father still receives mail at her address.

{¶ 46} We find appellant did not present evidence which produced a firm belief that she did not have contact or an ongoing relationship with father. Appellant therefore did not prove by clear and convincing evidence that she remedied the condition which caused the termination of her parental rights to her two children in the previous case. Furthermore, appellant did not establish that she can provide a legally secure permanent placement and adequate care for the health, welfare and safety of child 3. Thus, we conclude the trial court's judgment is supported by competent, credible evidence and was not against the manifest weight of the evidence. Accordingly, appellant's first assignment of error is found not-well taken.

15.

## Second Assignment of Error

{¶ 47} In her second assignment of error, appellant argues the trial court failed to grant legal custody of child 3 to M.C., a daycare provider, who had an approved home study as well as a signed understanding of legal custody, which was filed with the court.

{¶ 48} We have previously addressed this issue and have held parents, in permanent custody actions, lack standing to claim a trial court erred in failing to award custody of their children to a particular third party. *See In re R.V.*, 6th Dist. Lucas Nos. L-10-1278, L-10-1301, 2011-Ohio-1837, ¶ 15, *In re A.B.*, 6th Dist. Lucas Nos. L-12-1069, L-12-1081, 2012-Ohio-4632, ¶ 27-29 and *In re J.S.*, 6th Dist. Lucas No. L-14-1055, 2014-Ohio-3130, ¶ 25. Since appellant lacks standing to raise this argument, appellant's second assignment of error is not well-taken.

{¶ 49} On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Arlene Singer, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE