**[Cite as *In re J.T.*, 2014-Ohio-5816.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


In re J.T., E.K., D.K.                             Court of Appeals No. L-14-1151

                                                  Trial Court No. JC 12225105


                                                  **<u>DECISION AND JUDGMENT</u>**

                                                  Decided:  December 30, 2014

* * * * *

Tim A. Dugan, for appellant.

David T. Rudebock, for appellee.

* * * * *

**JENSEN, J.**

**{¶ 1}** This is an appeal from a judgment of the Lucas County Court of Common

Pleas, Juvenile Division, awarding permanent custody of J.T. (born September 22, 2000),

E.K. (born November 24, 2001), and D.K. (born October 26, 2002) to Lucas County

Children Services ("LCCS") and terminating the parental rights of the biological parents.

For the reasons that follow, we reverse the decision of the trial court and remand the matter for further proceedings consistent with this decision.

{¶ 2} Appellant El.K. is the biological mother of J.T., E.K., and D.K. ("the children").

{¶ 3} De.K. is the biological father of E.K. and D.K.

{¶ 4} J.N. is the biological father of J.T.

{¶ 5} Neither father is a party to this appeal. Thus we will not discuss, in detail, the case plan services and trial court findings that pertain to them.

## Factual Background

{¶ 6} On June 28, 2012, appellant stabbed her ex-husband, De.K., during a domestic dispute. Appellant was arrested and taken into custody, De.K. was hospitalized, and the children were placed in LCCS care. The next day, LCCS filed a complaint in dependency and neglect. The trial court placed the children in the temporary custody of LCCS following an emergency shelter care hearing. The initial goal of the LCCS case plan was to reunite appellant with her children.

{¶ 7} In August 2012, appellant entered a plea of no contest to aggravated assault, a violation of R.C. 2903.12(A)(a), a felony of the fourth degree. She was sentenced to three years of community control. Under the terms of her community control, appellant was committed to the Lucas County Correctional Treatment Facility for six months. She was required, in part, to participate in and successfully complete an anger management program and a domestic batterer's program, to submit to regular Breathalyzer testing with

2.

negative results, and to have no direct or indirect contact with De.K. Appellant was released from the Lucas County Correctional Treatment Facility in November 2012.

{¶ 8} In January 2013, the magistrate conducted a reasonable efforts review hearing and the following facts were placed on the record:

Children are in foster care and doing good. They receive individual [mental health] services. * * * [Appellant] was released from jail in November 2012 and has an assessment scheduled, she is participating in [domestic violence services], and also needs to do parenting [classes] and secure housing. Mother also [visits the children] regularly. The goal remains reunification.

{¶ 9} In February 2013, appellant was "with" De.K. for three days.

{¶ 10} In June 2013, LCCS filed a motion for extension of temporary custody asserting that while appellant had maintained stable housing and engaged in mental health, substance abuse, and domestic violence counseling, an additional six months was needed to complete the services. A hearing was held before a magistrate on June 27, 2013. The children's guardian ad litem failed to appear. After hearing testimony from the caseworker, Amanda Mellott, the magistrate granted LCCS's motion, indicating, in part, that the extension was in the best interest of the children and that significant progress had been made on the case plan.

3.

{¶ 11} During a September 25, 2013 meeting with LCCS staff, appellant was informed that LCCS would be seeking permanent custody of the children. When appellant walked out of the LCCS building, she was involved in a verbal altercation with De.K.

{¶ 12} On November 5, 2013, appellant received a certificate of completion for a domestic violence program coordinated by Family Service of Northwest Ohio.

{¶ 13} On December 11, 2013, LCCS filed a motion for permanent custody alleging that appellant "remains in a relationship with [De.K.] despite reporting that they are not together."

{¶ 14} On February 28, 2014, appellant filed a motion for legal custody acknowledging she was with De.K. for three days in March 2013, and further acknowledging the September 25, 2013 verbal altercation with De.K. Appellant asserted, however, that she was no longer "in a relationship" with De.K.

{¶ 15} Ann Baronas, the children's guardian ad litem[1], filed a report on March 24, 2014. The report contains the guardian's recommendation that permanent custody be granted to LCCS because it is in the "best interests of the minor children." The report indicates that the foster mother told the children that she would like to adopt them and

---

[1] On July 9, 2012, the trial court issued an order appointing Ann Baronas to serve as guardian ad litem for the children. We note, however, that on one occasion—in the second paragraph of the June 20, 2014 judgment entry—the trial court referred to Baronas as "Guardian Ad Litem and counsel for the children." Baronas is an attorney. However, she was never appointed to serve as the children's counsel in this matter.

promised them that if she did, she would allow the children to continue to visit with appellant and De.K. The guardian ad litem indicated that the children agreed to and "seemed satisfied" with this plan.

{¶ 16} The trial court held a two-day hearing on May 28 and 30, 2014.

{¶ 17} Ramona Bethany is a clinical therapist at Unison Behavioral Health Group. Bethany testified that in August 2013, appellant was referred to Unison to the women who use violence program. The following month, appellant's referral was rejected for failure to actively participate in the program. Shortly thereafter, appellant was referred to Unison's batterer's intervention program. From November 2013, through February 2014, Bethany met with appellant on five occasions. Bethany indicated that the meetings were disrupted during the months of March and April 2014, because appellant was temporarily dropped from Medicaid.

{¶ 18} In Bethany's opinion, appellant is both a victim of domestic violence and a perpetrator of domestic violence. Bethany was unable to conclusively state that appellant had made substantial progress towards decreasing the risk of domestic violence in her relationships.

{¶ 19} Jill Kuhlman is a therapist at Twelve of Ohio, Inc. Kuhlman testified that she had known the children for approximately ten months and had been working as their therapist for the last four of those months. Kuhlman indicated that she was working with J.T. to reduce her depression and increase her self-esteem. Kuhlman indicated that throughout her involvement in the case, J.T. had expressed a desire to go "home," but

5.

that she was torn between appellant, De.K., and the foster mom. Kuhlman indicated that J.T. has a "very big connection" with De.K. On cross-examination, Kuhlman acknowledged that J.T. would have a hard time adjusting to adoption because "[s]he seems very attached wanting to take care of mom and dad."

{¶ 20} Kuhlman indicated that she was working with E.K. on "his behaviors according to what's happening in the home at the time." Kuhlman explained that E.K.'s issues primarily involved his "arguing with his brother and getting along with everyone in the home." When asked whether the case had an impact on E.K., Kuhlman opined, "He's more torn than his siblings about not hurting anyone involved in the case. * * * Of course he want[s] to go with the bond, but he has a bond with the foster mom, too." On cross-examination, Kuhlman indicated that that E.K. "wants to go home, but he's okay with being adopted also."

{¶ 21} As to D.K., Kuhlman testified that she works with him on "his behaviors * * * [m]ainly fighting with his brother and then doing what he needs to be doing as far as school goes." On cross-examination, Kuhlman indicated that D.K. "wants to go home and it's always been that."

{¶ 22} Kim Grower Dowling is a clinical therapist with Unison Behavioral Health Group. Dowling testified that she first met with appellant for individual therapy in May 2013. Dowling indicated that appellant had been diagnosed with depression and post-traumatic stress, but that she worked primarily on helping appellant cope with

6.

post-traumatic stress. Dowling met with appellant 18 times between May 2013, and May 2014. The treatment goal was to "resolve the issues with the past trauma."

{¶ 23} Amanda Mellott is a caseworker at LCCS. She began working with the children in July 2012. Mellott indicated that since the beginning of the case, the children "have been consistent in their desire to maintain a relationship" with appellant and De.K. In the beginning of the case and in the "couple of months" leading up to the hearing, the children verbalized a desire to go home.

{¶ 24} Mellott opined that permanent custody was in the children's best interest because, "[t]he children have witnessed a great deal between their parents and they need structure and stability and a safe place to grow and thrive." Mellott opined that because appellant had not successfully completed domestic violence services, appellant could not provide a safe environment for the children.

{¶ 25} Appellant testified that she began a relationship with De.K. in 2000. Since that time, appellant and De.K. were married twice and divorced twice. Appellant admitted that when she and De.K. are together, they were often violent towards each other.

{¶ 26} Appellant indicated that she has lived in seven different places since she first began dating De.K. On multiple occasions she moved to get away from him. Despite moving, she either maintained or regained contact with De.K. and often assisted him in moving to or near her.

7.

{¶ 27} Appellant testified that she lost custody of her five oldest children in 1997: three were adopted and two were "placed in state's custody." She further testified that while living in Kentucky in 2007, she temporarily lost custody of J.T., E.K. and D.K. Upon successful completion of a domestic violence program in that state, the children were returned to her.

{¶ 28} Ann Baronas testified that as guardian ad litem, she "kept up to date on the case for the most part." She indicated that she met with the children and "had multiple meetings with [appellant]." She visited the foster home and indicated that no one had brought any foster home concerns to her attention. She further noted that she "stopped in" during one of appellant's visits with the children.

{¶ 29} Baronas opined that permanent custody was in the children's best interests because appellant and De.K. had not successfully completed the services. In her opinion neither parent would be able to provide a safe and stable environment for the children within a reasonable period of time.

{¶ 30} On cross-examination, the guardian ad litem indicated that the children were bonded with their parents and that they all want to maintain a relationship with their parents. When asked whether the children all want to be adopted, the guardian responded:

> Well, I wouldn't say that. Particularly [E.K] was very specific with me that he did not want to be put in a position of having to state what he wanted. He wanted to remain neutral. But presented with the idea of [the

8.

foster mother] is interested in adopting, you know, how do you feel about that? That would be okay with us. They did not want to be in a position of having to make a choice between their mother and their father and the foster mother. And they were very specific about it. We don't want to have to make that choice or at least have to verbalize that choice, but we do want to see the judge and we do want to talk to the judge.

And, again, particularly [E.K.] was very vocal about I want to -- I'll use the word neutral. That wasn't his word. He wanted to remain neutral but he wanted to talk to the judge and see the judge in private.

{¶ 31} After the hearing concluded, the trial court conducted interviews of the children, in camera.

{¶ 32} On June 20, 2014, the trial court issued a judgment entry denying appellant's motion for legal custody and granting LCCS's motion for permanent custody. Citing R.C. 2151.414(E)(1), (2), (11), and (16), the trial court found that permanent custody was in the best interest of the children and that LCCS had provided clear and convincing evidence that, despite reasonable efforts of LCCS, the children could not be returned to their parents. The trial court did not address the wishes of the children in its judgment entry, nor did it expressly state that it considered the wishes of the children.

9.

{¶ 33} Appellant filed a timely appeal and sets forth two assignments of error.

1.  The trial Court erred by not appointed [sic] separate counsel to the children.

2.  The decision to terminate Appellant's parental rights fell against the manifest weight of the evidence.

{¶ 34} In her first assignment of error, appellant cites *In re Williams*, 101 Ohio St.3d 398, 805 N.E.2d 1110, 2004-Ohio-1500, syllabus, for the proposition that "a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *Id.*  Appellant asserts the trial court erred when it failed to recognize a conflict between the wishes of the children and the guardian ad litem's recommendation. She seeks a remand so that separate counsel can be appointed to act as an advocate for the children's wishes.

{¶ 35} The purpose of a guardian ad litem in a permanent-custody proceeding is "to protect the interest of the child and 'assist a court in its determination of a child's best interest.'" *In re C.B.*, 129 Ohio St.3d 231, 2011-Ohio-2899, 951 N.E.2d 398, ¶ 14, citing R.C. 2151.281(B) and Sup.R. 48(B)(1).  The guardian ad litem's role is to "perform whatever functions are necessary to protect the best interest of the child, including, but not limited to * * * [filing] any motions and other court papers that are in the best interest of the child[.]"  R.C. 2151.281(I).  Where, however, a conflict exists between what a

10.

guardian ad litem believes is in the child's best interest and the child's wishes regarding placement, the child may be entitled to independent counsel. *In re. C.B.* at ¶ 17.

{¶ 36} In *Williams*, the Supreme Court, interpreting the plain language of R.C. 2151.352, held that "courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the possibility of the child's guardian ad litem being appointed to represent the child." *Williams* at ¶ 17.

{¶ 37} Since the Supreme Court's decision in *Williams*, we have addressed the question of a trial court's failure to appoint separate counsel on two occasions: *In re M.C.*, 6th Dist. Lucas No. L-09-1271, 2010-Ohio-1360, ¶ 45 (the trial court did not err in failing to appoint separate counsel because the child's desires and the recommendations of the guardian ad litem did not conflict "to the extent that an attorney was required" to represent the child's wishes) and *In re Amber L.*, 6th Dist. Williams No. WM-05-003, 2005-Ohio-4172 (trial court did not err in failing to appoint separate counsel because the recommendations of the guardian ad litem were consistent with the wishes of the children, "as expressed to her by the children and as expressed by the children directly to the court at the in camera review"). In both instances we found insufficient conflict between the child's wishes and the guardian ad litem's recommendation to warrant reversal.

{¶ 38} In the present case, however, after taking into account the age and maturity of the children, we find there is sufficient conflict between the children's wishes and the

11.

recommendation of the guardian ad litem to warrant reversal and the appointment of separate counsel to advocate the desires of the children.

{¶ 39} At the time of the dispositional hearing, J.T. was 13 years old, E.K. was 12 years old, and D.E. was 11 years old.[2] While the guardian ad litem testified that, in her opinion, the children wanted to remain "neutral," it is clear from our review of the record that throughout the case, the children continuously and repeatedly expressed a desire to maintain a relationship with appellant. It is also clear that in the seven or eight weeks preceding the dispositional hearing—after the guardian ad litem's report was filed—the children repeatedly expressed a strong desire to return home to their mother.

{¶ 40} In her March 24, 2014 report, Baronas declares the wishes of the children in the final paragraph of her two-page "case history," as follows:

> Foster mom has told the children that she would like to adopt them. The children are in agreement with this plan, but they also express a desire to continue to visit with their parents. Foster mom has promised[3] the children that she will allow the children to continue to visit with their parents, and the children seem satisfied.

---

[2] There is no evidence in the record that would suggest the children lacked the maturity to make a meaningful representation of their wishes.

[3] The foster mom did not testify and there is no evidence in the record that the children could, in fact, maintain a relationship with appellant if LCCS were granted permanent custody.

12.

{¶ 41} It is not clear when, or how often, the guardian ad litem inquired of the children's wishes. During the hearing, Baronas simply stated that she "met with the children" while she made it clear that she had "multiple meetings" with appellant.

{¶ 42} Upon our examination of the record, including the in camera interview, we find that throughout the case a conflict existed between the wishes of at least one of the children and the position of the guardian ad litem. It is also clear that in the two months leading up to the May 2014 hearing—after the guardian ad litem's report was submitted—all three children clearly and repeatedly expressed a desire to go home.

{¶ 43} According to Mellott, at the beginning of the case, and then again in April and May of 2014, all three children "verbalized that they want[ed] to go home." Throughout the case, the children were "consistent in their desire to maintain a relationship with the parents."

{¶ 44} According to Kuhlman the children have a bond with the foster mom, but each expressed a desire, throughout her involvement in the case, to go home. Kuhlman opined that J.T. and E.K. both have a bond with the foster mom but that they were "torn" and do not want to hurt anyone by having to choose between appellant, De.K., and the foster mom. Kuhlman indicated, however, that D.K. had "always" expressed a desire to go home.

{¶ 45} During the in camera interviews, the children each expressed affection for and a desire to continue a parent-child relationship with appellant. The trial court did not

13.

inquire of the children's wishes regarding placement. However, the children did assert, on their own accord, affection for appellant and a desire to maintain a relationship with her.

{¶ 46} In our review of the testimony and trial court's in camera interviews with the children, we find that a conflict exists between the children's wishes and the guardian ad litem's recommendation that permanent custody be awarded to LCCS. Upon consideration of the children's age and maturity, we find the trial court erred when it failed to recognize this conflict and appoint separate counsel to advocate the children's wishes. Accordingly, appellant's first assignment of error is well-taken.

{¶ 47} App.R. 12(A)(1)(c) requires this court to decide each assignment of error and give reasons in writing, unless an assignment of error is rendered moot by a ruling on another assignment of error. Based upon our disposition of the first assignment of error, we find the remaining assignment of error is rendered moot. *See also In re Allen*, 11th Dist. Trumbull No. 2008-T-0010, 2008-Ohio-3389, ¶ 24.

{¶ 48} On consideration, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is reversed. The matter is remanded to said court to appoint an attorney to represent the children's interests and conduct further proceedings in conformity with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

14.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.          _____
                                              JUDGE

Arlene Singer, J.          

James D. Jensen, J.                _____
CONCUR.                                       JUDGE


                                  _____
                                              JUDGE


This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.