[Cite as *In re J.H.*, 2025-Ohio-4383.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re J.H., A.H., T.Y.

Court of Appeals No. {39}H-25-007
{39}H-25-008
{39}H-25-009

Trial Court No. DNA-23-0002
DNA-23-0003
DNA-23-0004

**DECISION AND JUDGMENT**

Decided: September 18, 2025

* * * * *

Richard H. Palau, for appellee.

Anthony J. Richardson, II, for appellant.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} This matter is before the court on the consolidated appeal from the judgment of the Huron County Court of Common Pleas, Juvenile Division, finding J.H. (d.o.b.1/24/2013), A.H. (d.o.b.011/20/2014), and T.Y. (d.o.b.11/09/2017) were dependent children and J.H. was an abused child, and granting permanent custody of the children to the Huron County Department of Job & Family Services (HCDJFS). Because we find no error with the juvenile court's judgment, we affirm.

## II. Facts and Procedural Background

{¶ 2} HCDJFS first had contact with the family of J.H., A.H., and T.Y., in 2019, and the juvenile court adjudicated J.H., A.H., and T.Y. as dependent children following physical violence in the home. The children were placed in temporary custody of HCDJFS, and appellant, mother, and the father of T.Y.[1] engaged in services that included counseling and parenting classes. The children were returned to the home in April 2020, and HCDJFS terminated protective supervision. In September 2022, mother and father were involved again with HCDJFS in a voluntary case that did not result in a complaint filed with the court.

{¶ 3} The events precipitating the present action began with a Norwalk police investigation of physical violence by father against J.H., in January 2023. HCDJFS filed a complaint alleging the children to be dependent pursuant to R.C. 2151.04(C), and J.H. to be an abused child pursuant to R.C. 2151.031(D).[2] At the shelter care hearing held on January 6, 2023, the children were removed from mother's home and placed in temporary

---

[1] Mother is married to the father of T.Y., who acted as parent to the boys and participated in the proceedings in the trial court. The fathers of J.H. and A.H. were not present for trial. The attorney for J.H.'s father informed the trial court he had no contact with his client. The father of A.H., through his counsel, consented to permanent custody. J.H.'s father and A.H.'s father are not parties in this appeal. For ease of discussion, we refer to the father of T.Y. as "father."

[2] The complaint was filed in three separate cases, DNA 2023-00002, *In re J.H.*, DNA 2023-00003, *In re A.H.*, and DNA 2023-00004, *In re T.Y.* The matter proceeded to trial as to all three children, and upon appeal in all three cases, we consolidated the cases on appeal.

2.

custody of HCDJFS. J.H. and A.H. were placed together in a foster home, and T.Y. was placed in a separate foster home. At the adjudicatory hearing on February 23, 2023, mother admitted that all three children were dependent and J.H. was abused.

{¶ 4} The juvenile court adopted the case plan submitted by HCDJFS, which included mental health assessments and treatment for the children, mental health assessment and treatment, parenting instruction, and obtaining secure housing and employment for mother, and mental health assessment and treatment, anger management, parenting instruction, and obtaining secure housing and employment for father.

{¶ 5} In June 2023, the Norwalk police opened an investigation of father into reports that father had sexually assaulted A.H. and J.H. prior to their removal from the home. In August 2023, A.H. and J.H. disclosed abuse to Norwalk police detective Hamernick, and after denying the accusations, father admitted that he "lost control" and "got caught up in the moment" and inappropriately touched the boys for sexual gratification on numerous occasions. Father was indicted in October 2024 on multiple counts of gross sexual imposition, endangering children, and domestic violence, and his charges remained pending at the time of disposition and judgment in the present case.

{¶ 6} Father remained in custody during the latter part of these proceedings, unable to post bond to secure pre-trial release. Based on the recorded jail calls between mother and father, mother remained committed to father, attempting to support him by retaining counsel and expressing her love to him. Mother also lied to HCDJFS about her continuing support and contact with father, and asked father to do the same.

3.

{¶ 7} On July 2, 2024, HCDJFS filed a motion for permanent custody as to all three children. On September 16, 2024, HCDJFS filed an amended motion for permanent custody. In support of the amended motion, HCDJFS outlined "immediate unresolvable concerns and trauma of the children." HCDJFS noted that father admitted to police that he sexually abused J.H. and A.H., providing statements to police "that should alarm any normal person." Additionally, father indicated he discussed his urges with mother prior to entering a relationship with her. Despite knowledge of father's urges, mother introduced father to J.H. and A.H., "submitting them to tremendous harm." HCDJFS noted numerous incidents of father assaulting the children, and as a result, J.H. suffers from post-traumatic stress disorder.

{¶ 8} HCDJFS noted substantiated allegations connected to the 2019 case regarding mother physically abusing the boys and father using excessive physical discipline, followed by reports of injury to the boys beginning in 2020, that resulted in additional case plan services continuing through 2022. In the present case, HCDJFS opened a complaint based on physical abuse on January 5, 2023, and opened a sexual abuse investigation on June 24, 2023, culminating in the criminal case against father.

{¶ 9} Mother completed some of her case plan services, completing her mental health assessment and attending counseling services. Mother also completed a psychological evaluation, but while she was compliant in attending counseling, she was unable to make progress in remedying issues related to the present case and prior cases with HCDJFS. Furthermore, mother did not share her psychological assessment

4.

recommendations with her counselor so that those recommendations might be addressed. Mother also attended parenting classes and a family counseling program, but multiple concerns remained regarding mother's ability to protect her children from harm, especially considering her continued relationship with father, "who is a substantiated predator of both physical and sexual abuse against [J.H. and A.H.]." HCDJFS did not believe mother could protect the children from father.

{¶ 10} HCDJFS also noted that, despite repeated parenting classes in the present and prior cases, concerns remained about mother's parenting skills and her lack of bonding with the children. Mother's visitation with J.H. and A.H. demonstrated her difficulty interacting with J.H. in a positive manner, with mother struggling to take any responsibility when J.H. brought up the subject of the abuse. Mother responded to A.H more enthusiastically, but A.H. was less likely to bring up past abuse with mother. Mother responded appropriately in visits with T.Y., but when she interacted with all three children together, she struggled to give attention to all three and was unable to complete the family counselling program without assistance from a caregiver to manage the behaviors of all three children. Mother had weekly, supervised visits with T.Y., but for most of the proceedings had visitation with J.H. and A.H. via zoom, with several weeks of no visitation at all. Furthermore, mother's contact with the children coincided with setbacks in the children's therapeutic progress, as reported by caregivers.

{¶ 11} The children all received assessments and case plan services. J.H. and A.H. were placed in foster care together, and both J.H. and A.H. required initial treatment in a

5.

residential setting. J.H. transitioned to foster care, but A.H. required more care in the residential treatment facility. J.H. was diagnosed with post-traumatic stress disorder, and struggled with sexualized behavior, outbursts, and difficulty communicating with others. A.H. struggled with aggressive and violent behavior, causing his removal from his foster home for treatment. However, A.H. spent holidays in his foster home and had contact with the foster family and his siblings, and both J.H. and A.H. are bonded with their foster family. T.Y. was in foster care, diagnosed with sensory integration dysfunction, and she struggles with sexualized behaviors, outbursts, and listening/following directions. T.Y. was receiving necessary services to address her behaviors in foster care.

{¶ 12} HCDJFS was unable to locate any appropriate, acceptable relative placements for the children. Mother's sister in West Virginia expressed interest in placement, but HDJFS learned the sister had a history with CPS and there were concerns regarding sister's husband as a perpetrator of sexual abuse. The foster parents for J.H., A.H., and T.Y. expressed interest in adopting the children, with J.H.'s and A.H.'s foster parents intending immediate adoption of J.H., with a willingness to wait until A.H. is released from residential treatment.

{¶ 13} On September 30, 2024, mother filed a motion seeking family counseling. HCDJFS opposed the motion, recommending against family counseling due to the children's behavior before and after visitation with the parents, and agreeing with the assessment of the children's therapist that "continually putting the children in situations with [mother] and [father] is inhibiting their ability to heal from the trauma endured in

6.

the home… by re-opening unhealed emotional wounds again and again." The juvenile court denied the motion for family counseling.

{¶ 14} On October 9, 2024, mother filed a motion for temporary custody of all three children. Mother addressed the concerns of HCDJFS regarding father's contact with the children and argued that father no longer resided in the home. Mother's motion did not address any of the other concerns raised by HCDJFS. The children's guardian ad litem and HCDJFS opposed the motion. The juvenile court denied the motion for temporary custody, finding temporary custody not in the best interests of the children.

{¶ 15} On November 6, 2024, trial on the motion for permanent custody was held, and the parties submitted closing statements in writing, raising due process concerns for the first time regarding the children's legal representation. On December 2, 2024, the juvenile court determined in a written entry that T.Y. was not afforded due process where she maintained a position contrary to that of her siblings and the position argued by the guardian ad litem, specifically her desire to remain with mother and father. The juvenile court noted the guardian ad litem recommended permanent custody with HCDJFS, and J.H. and A.H. "have strong opinions that are in harmony with the guardian ad litem's recommendations." The juvenile court declared a mistrial and ordered retrial of only the permanent custody motions, after appointment of separate counsel for T.Y. to represent her position and ensure due process.

{¶ 16} A retrial on the HCDJFS motion for permanent custody was held on February 12, 2025. Mother and father were present, and the juvenile court heard

7.

testimony from the police detective regarding his investigation of sexual abuse, the children's therapist, the foster mothers, the HCDJFS supervisor, and the children's guardian ad litem.

{¶ 17} The detective testified regarding the criminal proceeding, noting father admitted to the conduct and mother was likely aware of father's proclivities if not the actual instances of abuse. Recordings of jail calls between mother and father were also played, demonstrating mother's desire to remain in a relationship with father and assist in his defense, as well as mother's intent to mislead HCDJFS regarding the continuing relationship, despite the criminal charges for sexual abuse of her children.

{¶ 18} The children's therapist diagnosed all three with post-traumatic stress disorder based on exposure to violence in the home. T.Y.'s seminal event was the night father choked J.H., and J.H. and A.H. suffered from flashbacks, dissociation, hyperactivity, and depression. T.Y was placed in foster care and received occupational and physical therapy to address her difficulty with social engagement with peers and regulating her emotions. T.Y. displayed sexualized behaviors and a lack of appropriate boundaries with strangers. J.H. and A.H. were both placed in a residential treatment facility for a time, then placed together with another family. Both also displayed sexualized behavior, with A.H. physically violent toward himself and others. J.H. remained with the foster family and A.H. received treatment in the residential treatment facility.

8.

{¶ 19} The foster mothers each testified regarding the children's sexualized behaviors and struggles in coping with the trauma they suffered. The foster parents facilitated the children's therapies, ensured contact between T.Y. and her brothers, and noted progress in the children's treatment. They expressed love for the children, and a desire to adopt and to facilitate a continuing relationship between T.Y. and her brothers despite separate placements.

{¶ 20} The HCDJFS supervisor testified regarding completion of case plan services. Mother completed some of her case plan services, attending mental health counseling and participating in the entry-level parenting instruction. However, mother did not fully disclose the history of violence to her counselor, and her lack of engagement in the parenting class resulted in no further sessions recommended. Mother also demonstrated an unwillingness to communicate with HCDJFS regarding housing for herself, and she expressed anger toward the boys as the cause of the removal from the home. Additionally, contact with mother during scheduled visits was linked to an aggravation of the children's symptoms, and J.H. and A.H. continued to display fear and anger toward father. In contrast, the children continued to make progress in their placements, although A.H. remained admitted into a residential treatment facility due to his extensive needs.

{¶ 21} The guardian ad litem assigned to the case noted the progress made by the children, while also stating the children will need a custodian with strong parenting skills to address their needs, and mother lacked the necessary skills to understand and address

9.

the children's trauma without denying the trauma or blaming the victims. The guardian ad litem acknowledged that T.Y. expressed a desire to live with her parents but focused on the toys in the family home, relative to this desire. J.H. and A.H. both remained fearful of father, and A.H. expressed a desire to live with his foster parents along with mother and a "new dad." However, because mother remained married to father despite the history of physical and sexual abuse and had not obtained the necessary skills to parent according to the children's needs, the guardian ad litem believed the children could not return to mother within a reasonable time.

{¶ 22} On February 18, 2025, mother filed her closing statement. Mother argued that HCDJFS failed to demonstrate that reunification with mother within a reasonable time was not possible, by clear and convincing evidence. In support, mother argued she complied with all case plan requirements, and concerns regarding father are no longer relevant as father is incarcerated and not in the home, and father has stated his intent to move a distance away from Huron County upon his release. Mother further argued that T.Y. expressed a desire for reunification, and A.H. has also expressed a desire for reunification should father be removed from the home. Mother did not raise any due process concerns relative to A.H.'s expressed desire, however, and did not seek a mistrial or appointment of counsel for A.H.

{¶ 23} On February 27, 2025, the juvenile court issued a written decision and judgment. Applying applicable law to the facts, the juvenile court found by clear and convincing evidence that T.Y. was in temporary custody of HCDJFS for 12 or more

10.

months for a consecutive 22-month period, and all three children cannot be placed with mother or the father within a reasonable period of time, and the factors set forth in R.C. 2151.414(E)(1) and (15) applied. The juvenile court noted that father committed abuse against J.H. and A.H. on multiple occasions, and J.H. was adjudicated an abused child on February 23, 2023.

{¶ 24} After reviewing the factors set forth in R.C. 2151.414(D), the juvenile court clearly and convincingly found that placing all three children in the permanent custody of HCDJFS was in the children's best interest, noting HCDJFS had to intervene on the children's behalf on three occasions within the span of four years, filing dependency cases in 2019, entering into a voluntary safety plan in 2022, and filing dependency and abuse cases in 2023. The juvenile court further noted that father admitted to the conduct that resulted in criminal charges of gross sexual imposition, child endangerment, and domestic violence, and despite knowledge of these circumstances, mother "remains committed to her husband, blames the children for the trauma they endured, failed to successfully complete even a basic, rudimentary parenting course, failed to accurately disclose the history of trauma to her counselor, and lies to the agency about her continued contact and involvement with [father]." Finally, the juvenile court noted that the children were receiving treatment and therapy, the foster parents "are committed to them, and have expressed a desire to adopt them…[and the] children have established a bond with their respective foster parents."

11.

{¶ 25} The juvenile court found, clearly and convincingly, that placement in the permanent custody of HCDJFS was in the children's best interest and granted the motion for permanent custody. The trial court ordered placement with HCDJFS and implementation of an adoption plan.

{¶ 26} Mother filed a timely appeal of the judgment.

### III. Assignments of Error

{¶ 27} On appeal, mother asserts the following assignments of error:

First Assignment of Error: The trial court committed reversible error by failing to appoint A.H. and J.H. separate attorneys.

Second Assignment of Error: The trial court committed reversible error because terminating appellant's parental and her children's familial rights was not supported.

Third Assignment of Error: The trial court committed error by hindering and infringing on appellant's parental and her children's familial rights, where Ohio statutes would be unconstitutional as applied.

### IV. Analysis

#### A. Appointment of Counsel

{¶ 28} In her first assignment of error, mother argues the juvenile court committed reversible error by failing to declare a second mistrial and appoint separate counsel for A.H., to afford due process in a third trial. Mother bases this argument on the following testimony by the foster mother:

[on direct]

Q: And if the Agency were to obtain permanent care and custody, what is your intention in regards to [A.H. and J.H.]?

12.

A: [J.H.], we would want to adopt him as soon as we could. [A.H. and J.H.], our intention would be to bring them altogether, but also with the recognition that there is a lot of animosity at the moment between the two of them, because of the situation they're in. [A.H.] blames [J.H.] for telling about the physical abuse. He blames [J.H.] for them not having in-person visitation anymore, because he should have told mom to stop. There is a lot of, there is a lot of that would have to happen for the two of them, but the intention is to do those things and to bring them back together.

…

[on cross-examination]

Q: And I believe it was your testimony that [A.H.] continues to – well, let me rephrase that.

    You said that [A.H.] has expressed frustration with [J.H.] for no longer being permitted to have in-person contact with mom, correct?

A: Correct.

Q: So is it your belief that [A.H.] wishes to continue to see mom?

A: I, that's a hard question. Because, yes, of course, she's his mother. He wants to see her. But he also recognizes that what she was doing was inappropriate and is angry at [J.H.] for not being the adult in the situation and stopping the conversations from happening. He's not willing to allow her to take any responsibility. And I would have to say, yes, he wants to see her, but do I feel that that's in his best interest developmentally?

Q: Thank you, that was my question. Thank you. And I guess I'm just not real sure. I heard the testimony about the difficulties with the two boys, you know, possibly being together.

…

    Do you know, you said that it was [J.H. or A.H.] wanted to see mom. Is there a distinction between seeing mom and living with mom?

A. They, [A.H.] specifically wants to go home because he will flat out tell you he wants his things. So I don't know if he's making the difference between having his things that are at home and being in the same situation. He loves her and wants to speak with her, but I think he also recognizes that it's not safe the way it was.

Q: And in the discussions you had with possibly living with mom, is there a reaction by either of the boys relative to that discussion? I mean, like do either them act violently, act negatively – I won't say violently – negatively or positively to a discussion with that implication?

A: Yes. So, even just a discussion about mom invokes huge behaviors out of both children. [J.H.] is more anxiety, fear, those things; whereas [A.H.] gets physically aggressive. Every time that we had to have the sheriff out to our house was post visitation. And that's when he put holes in the wall. That's when he tried to –

Q: Meaning?

A: [A.H.]. Tried to cut people with glass. Those are all post visitation. [J.H.] will flat out tell you, 'Absolutely not. I can never do that again. She didn't keep me safe.' [A.H.], 'I love my mom. She did what she could.' So.

{¶ 29} In addition to the testimony of J.H.'s and A.H.'s foster mother, the guardian ad litem testified regarding A.H.'s wishes, indicating, "[A.H.] has repeatedly expressed to me that he wishes for his mom to get a new dad. When I asked what he meant by that, he means that he tells me he wants his mom to no longer be with [father], who they were told to call dad and that was their dad." The guardian ad litem further testified:

> And speaking to [A.H.] about him wanting to, his mom to get a new dad, which was his word, you know, I asked him then, 'If your mom had a new dad, would want to live there?' Because he has always expressed to me that he does not want to see [father], he doesn't want to live with [father], he doesn't want to be anywhere [father] is.
> So I said, 'If your mom had the new dad, would you want to live with him – or live with your mom and the new dad?' And I feel like that was something that he really, he thought about for a long time. And most recently when we had talked about that, he had asked me, 'Well, would my brother and my sister live there?' And I said, 'I don't know. Your sister wants to live with your mom and her dad[.] Your brother [J.H.] does not wish to live with your mom and does not want anything to do with [father.]'

And [A.H.] said, 'Well, I want to live with my brother. My brother, that's my brother.' And he's always said that to me, 'That's my brother.' He wants to live with him.

And I said, 'Well, your brother's wishes are that he wishes for the [foster family] to adopt him.' Because [J.H.] has expressed at length that he wants his last name to be [foster family's name]. This is a big thing for him…

And [A.H.] said, 'Well, I want to be adopted by the [foster family] too. Their house makes me feel safe. I want to live in the [foster] house, but I also would like it if my mom and my new dad lived with me in that house.' So, those were Anthony's wishes.

{¶ 30} It is well-settled law that "a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *In re Williams,* 2004-Ohio-1500, syllabus. In determining whether circumstances require appointment of counsel, courts determine the issue on a case-by-case basis in addressing whether a child consistently expressed a desire that was opposite from the recommendation of the guardian ad litem. *In re M.C.,* 2010-Ohio-1360, ¶ 45 -46 (6th Dist.), citing *Williams* at ¶ 17 (additional citations omitted.). To determine whether a child has a right to counsel, "a court must decide whether the child actually needs independent counsel, 'taking into account the maturity of the child and the possibility of the child's guardian ad litem being appointed to represent the child.'" *In re Amber L.,* 2005-Ohio-4172, ¶ 87 (6th Dist.), citing *Williams* at ¶ 17 (additional citation omitted.).

{¶ 31} We have previously considered the need for separate counsel where a child has expressed various, conditional wishes, as A.H. expressed in this case, and found insufficient conflict to merit appointment of counsel. In *In re M.C.,* 2010-Ohio-1360 (6th

15.

Dist.), the children expressed a desire to live with the father, if father's girlfriend did not also live there. The children also expressed a desire to live with family in another state or to reside with the foster parent. *In re M.C.* at ¶ 51. In considering the various wishes expressed by the children, we found no error in the failure to appoint an attorney to represent the children based on the conditional desire to live with father. *Id.* at ¶ 52.

{¶ 32} In contrast, we have determined separate counsel was necessary where there was "sufficient conflict between the children's wishes and the recommendation of the guardian ad litem[.]" *In re J.T.,* 2014-Ohio-5816, ¶ 38 (6th Dist.). In *In re J.T.,* the guardian ad litem testified that the children "wanted to remain 'neutral,'" but the record demonstrated, instead, that "the children continuously and repeatedly expressed a desire to maintain a relationship" with the parent, and after the guardian ad litem's report was filed, "repeatedly expressed a strong desire to return home to their mother." *In re J.T.,* at ¶ 39. Based on this dichotomy, the record did not clearly demonstrate that the guardian ad litem inquired into the children's wishes, and we found error based on the lack of separate counsel to represent the children's interests. *Id.* at ¶ 41- 42.

{¶ 33} In this case, mother noted A.H.'s wishes in closing argument, but she points to nothing in the record demonstrating mother requested appointment of counsel for A.H. or that A.H. repeatedly expressed a desire to remain with mother. The record, moreover, demonstrates A.H. expressed only a *conditional* wish to live with mother and a potential "new dad" at the foster family's home. A.H. otherwise expressed a desire to stay with his brother, or to stay with his foster family, where he felt safe. Considering

16.

these circumstances, the guardian ad litem inquired into A.H.'s interests and advocated accordingly, and we do not find error in the juvenile court's failure to appoint separate counsel for A.H. Mother's first assignment of error is not well-taken.

### B. Permanent Custody Determination

{¶ 34} In her second assignment of error, mother argues the juvenile court's termination of her parental rights was not supported by clear and convincing evidence. In support, mother argues that she did not continuously and repeatedly fail to remedy the conditions that led to removal of her children but instead was misled by HCDJFS and the juvenile court regarding potential reunification of her family. Specifically, mother argues she did everything asked of her to achieve reunification, and "it was not abundantly clear that divorcing and leaving her husband…was the only way to make that possible." Next, mother argues that termination of parental rights was not in the best interest of the children.

{¶ 35} A court may grant permanent custody only upon demonstration of factors under R.C. 2151.414, based on clear and convincing evidence. As pertinent in this case, the juvenile court was required to find that the children could not be placed with either parent within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1), and that permanent custody to HCDJFS was in the best interests of the children, R.C. 2151.414(D). In assessing whether the children could be or should be placed with the parents within a reasonable time under R.C. 2151.414(B)(1)(a), the

17.

juvenile court was required to consider the factors under R.C. 2151.414(E). *In re I.D.,* 2014-Ohio-238, ¶ 26 (6th Dist.), citing *In re B.K.,* 2010-Ohio-3329, ¶ 43.

{¶ 36} Mother challenges the juvenile court's findings as to both prongs, under R.C. 2151.414(E) and 2151.414(D).

{¶ 37} An award of permanent custody under R.C. 2151.353(A)(4) must be supported by clear and convincing evidence. *In re I.H.,* 2020-Ohio-4853, ¶ 33 (6th Dist.), citing *In re B.K.,* 2017-Ohio-7773, ¶ 16 (6th Dist.) (additional citation omitted). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 471 (1954), paragraph three of the syllabus.

{¶ 38} The appellate standard of review for permanent custody determinations is sufficiency of the evidence or manifest weight of the evidence, depending on the nature of the arguments presented by the parties. *In re Z.C.,* 2023-Ohio-4703, ¶ 18. In this case, mother challenges the weight, and not the sufficiency, of the evidence. Accordingly, we will not reverse the judgment on permanent custody as against the manifest weight of the evidence where the record contains some competent, credible evidence by which the court could have formed a firm belief as to the essential statutory factors for termination of parental rights. *In re Denzel M.*, 2004-Ohio-3982, ¶ 8 (6th Dist.).

18.

{¶ 39} R.C. 2151.414(E) addresses the determination of whether a child cannot or should not be placed with a parent within a reasonable time, considering all relevant evidence. *See* R.C. 2151.414(E). "If the court determines, by clear and convincing evidence, at a hearing held pursuant to … division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." The juvenile court determined the following sections under R.C. 2151.414(E) applied:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
> …
> (15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

{¶ 40} First, mother argues that she demonstrated her efforts to remedy the conditions that led to the children's removal, and she was misled that reunification was a possibility, where HCDJFS and the juvenile court required her to divorce father to

achieve that goal. In focusing her argument on a "divorce requirement," however, mother ignores the broader record that demonstrated she prioritized father over her children and was only partially compliant with her case plan objectives. Despite parenting classes, mother lacked the necessary skills to manage her children's needs and behaviors, and her own counseling could not address the history of violence that existed, considering she withheld that information from her therapist. The juvenile court specifically noted that mother failed to successfully complete "basic, entry-level parenting instruction," and mother had knowledge of father's abuse and "at best, acquiesced to it."

{¶ 41} The record demonstrated mother continued and maintained her relationship with father and was unsuccessful with case plan objectives addressing therapeutic goals due, in part, to her withholding of pertinent information. This was sufficient to find a failure to remedy the conditions that caused the children to be removed from the home, constituting evidence that also demonstrated mother's unwillingness to protect the children from father and prevent future abuse. *In re Delfino,* 2005-Ohio-320, ¶ 35 (6th Dist.); *In re D.C.,* 2017-Ohio-8728, ¶ 42-46 (6th Dist.). In arguing remedy, moreover, mother simply argued that father's incarceration solved matters by removing him from the home, rather than demonstrating that she chose her children over father, affirmatively ending her relationship with father in favor of keeping her children safe. Finally, the record provides no support for an implied divorce requirement imposed by HCDJFS, as a condition for reunification, considering mother's demonstrated ties to father would likely survive a change of legal status through divorce.

20.

{¶ 42} While mother argues other factors demonstrate her efforts to remedy the conditions, the juvenile court's finding as to any one of the factors under R.C. 2151.414(E) is sufficient to support the conclusion that the children cannot or should not be placed with mother within a reasonable time. *In re T.H.,* 2025-Ohio-344, ¶ 41 (6th Dist.), citing *In re S.J.,* 2024-Ohio-5137, ¶ 29 (6th Dist.) (additional citation omitted.). Here, the juvenile court specifically determined that mother remained committed to father, failed to successfully complete a parenting class or address issues related to the abuse in therapy, and demonstrated acquiescence to father's harmful conduct toward her children.

{¶ 43} Considering the record, mother failed to present evidence demonstrating she would no longer maintain contact with father or permit father to have contact with the children. *In re D.C.* at ¶ 46 ("appellant did not present evidence which produced a firm belief that she did not have contact or an ongoing relationship with father"). The record, instead, demonstrated mother's commitment to father and willingness to mislead HCDJFS regarding her true feelings, and the record contained competent, credible evidence to support the juvenile court's judgment regarding her remedy of conditions, pursuant to R.C. 2151.414(E)(1) and (15). *See In re A.J.,* 2014-Ohio-421, ¶ 61 (6th Dist.) (findings under R.C. 2151.414 (E)(15) supported where mother failed to acknowledge or protect against serious abuse by another).

{¶ 44} Mother further argued that the best interest determination lacked specific findings and the trial court's judgment, therefore, lacked support in the record. The

21.

second finding necessary in adjudicating the complaint for permanent custody required a finding that "in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child." R.C. 2151.353(A)(4). R.C. 2151.414(D)(1) provides:

> [T]he court shall consider all relevant factors, including, but not limited to, the following:
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 45} In challenging the juvenile court's findings regarding the best interests of the children, mother acknowledges that the court cited the relevant statute and provided findings, albeit without referencing specific statutory sections. Mother also focuses her challenge on her disagreement with the factual findings, arguing the evidence

22.

demonstrated a contrary finding as to each of the factors under R.C. 2151.414(D)(1)(a)-(e).

{¶ 46} As an initial matter, R.C. 2151.414(D)(1) requires only consideration of the enumerated factors and "does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.*, 2020-Ohio-5102, ¶ 31. Thus, the juvenile court had no obligation to state its findings with specific reference to the enumerated factors. *In re T.J.*, 2021-Ohio-4085, ¶ 39 (6th Dist.), citing *In re A.M.* at ¶ 31. The findings provided, therefore, complied with the requirements under the statute.

{¶ 47} Mother also challenges the juvenile court's findings, arguing a different interpretation of the evidence in the record. To be clear, mother does not point to any erroneous recitations of fact by the juvenile court, but only argues the facts support her conclusions, and not those of the juvenile court. Our review of the best interest findings, however, is based on the manifest weight of the evidence, requiring deference to the juvenile court's determination of witness credibility and the weight given by the court to evidence and testimony. (Citations omitted) *In re T.J.* at ¶ 40. In this case, the juvenile court considered the evidence and testimony and provided its findings, based on that consideration. "Its discretion in determining whether an order of permanent custody is in the best interest of a child 'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re T.J.* at ¶ 40, quoting *In re C.P.*, 2009-Ohio-2760, ¶ 10 (10th Dist.).

23.

{¶ 48} Upon careful review of the juvenile court's findings, the statutory factors, and the record in this case, we find no error regarding the best interest of the child findings in this case. Therefore, having determined the juvenile court's findings are supported by clear and convincing evidence as to the required considerations under R.C. 2151.414(E) and (D), we find mother's second assignment of error not well-taken.

## C. Constitutionality of R.C. 2151.414.

{¶ 49} Finally, in her third assignment of error, mother argues that reversal is necessary because termination of her parental rights under R.C. 2151.414 is unconstitutional as applied, because mother was a fit parent and termination was not the proper alternative of last resort. Mother raised no constitutional challenge in the juvenile court, and in support of her argument on appeal, asserts only the merits of her first two assignments of error as demonstrating that termination of parental rights was unconstitutional as applied. While courts have found constitutional argument waived by a parent, based on the failure to assert such argument in the juvenile court, we have previously addressed the constitutional challenge to R.C. 2151.414, "[b]ecause due process for termination of parental rights presents a continuing concern[.]" *In re Tyler C.,* 2008-Ohio-2207, ¶ 78-79 (6th Dist.).

{¶ 50} Mother asserts an "as applied" challenge but does not articulate any specific application of the statute as unconstitutional. Additionally, due to the lack of challenge in the juvenile court, there is no record on appeal to review so as to clarify mother's present challenge. Upon careful consideration of the argument, mother appears

24.

to argue infringement of her substantive due process rights based on her conclusion that she was a fit parent, a conclusion rejected by the juvenile court.

{¶ 51} The right to parent one's child is a basic right, but not an absolute right, as a parent's rights are subject to the ultimate welfare of the child. *In re Murray,* 52 Ohio St.3d 155, 157 (1990); *In re Cunningham,* 59 Ohio St. 2d 100, 106 (1979). Considering a parent's rights, the law must afford "every procedural and substantive protection" permitted. (Citation omitted) *In re Hayes,* 79 Ohio St.3d 46, 48 (1997). In challenging R.C. 2151.414, mother argues the statute is unconstitutional as to her particular conduct, without any argument linking her conduct to a due process violation.

{¶ 52} Mother argues issues of substantive due process, but points to no failure of process within the proceedings and identifies no specific provision within R.C. 2151.414 that offends due process. We previously addressed the statutes at issue, R.C. 2151.353 and 2151.414, and found they "comport with the requisites of due process," containing provisions "for notice, separate adjudicatory and dispositional hearings and a 'clear and convincing evidence' standard of proof." *Matter of Whiteman,* 1993 WL 241729, *20 (6th Dist. Jun. 30, 1993). The Ohio Supreme Court has addressed the "clear and convincing" burden under the statute, and determined R.C. 2151.414 "strikes a proper balance between the fundamental rights of both parents and children…in which the 'clear and convincing evidence' standard" satisfies constitutional due process requirements. *In re Schmidt,* 25 Ohio St.3d 331, 335 (1986).

25.

**{¶ 53}** Here, mother does not identify the facts that support her "as applied" challenge to R.C. 2151.414. Instead, mother challenges the juvenile court's factual findings under the statute, as articulated in her other assignments of error. Having found no merit to mother's argument in that regard, we find no basis to support her "as applied" constitutional challenge to the entirety of R.C. 2151.414 in her third assignment of error. Accordingly, we find mother's third assignment of error not well-taken.

## V. Conclusion

**{¶ 54}** Finding substantial justice has been done, we affirm the judgment of the Huron County Court of Common Pleas, Juvenile Division. Appellant, mother, is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.          _____
                                                      JUDGE

Gene A. Zmuda, J.          

Charles E. Sulek, P.J.         _____
CONCUR.                                                      JUDGE

                                               _____
                                                      JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.